No. 35,867

The State of Kansas, *Appellee,* v. Fred L. Brady, *Appellant.*

(137 P. 2d 206)

Opinion filed
May 8, 1943.

*C. H. Quier,* of Winfield, argued the cause for the appellant.

*John A. Herlocker,* county attorney, and *Frank G. Theis,* of Arkansas City, argued the cause, and *A. B. Mitchell,* attorney general, and *W. P. Timmerman,* assistant attorney general, were on briefs of the appellee.

The opinion of the court was delivered by .

Hoch, J.: Appellant pleaded guilty to the crime of murder in the first degree and was sentenced to death. He appeals from the judgment and from the order overruling his motion for a new trial. His contentions are that our statutes provide no method for carrying into effect a death penalty, except upon conviction after trial by jury, and that there is no specific statute which empowers the trial court to fix the day for executing the death sentence and that there-

fore there is no lawful way in which such sentence can be carried out.

Although the facts are not in dispute and there is no contention that the defendant's confession and formal plea of guilty were obtained by the use of force, by threats, intimidation, or other improper means, or that he did not have a fair trial, we think it advisable on account of the gravity of the case to relate the principal facts.

The appellant, Fred L. Brady, was arrested in Cowley county, Kansas, on January 10, 1943, for the murder on January 9, 1943, of one Joe Williams, a colored man. He confessed having committed the crime, waived preliminary hearing, and on January 11 was bound over to the district court of Cowley county for trial. An information signed by John A. Herlocker, county attorney, was filed charging the defendant with murder in the first degree. (G. S. 1935, 21-401.) The defendant was thereupon brought before Honorable Stewart S. Bloss, judge of the district court, advised of the nature of the charge, and C. H. Quier, a reputable practicing attorney of Winfield, Kan., appointed to represent him.

On January 13, 1943, the defendant appeared in person and by his attorney, the state being represented by the county attorney. The following proceedings thereupon took place:

"By the court: Will you stand up, Mr. Brady? (The defendant stands up in front of the judge's bench.)

By the court: Your name is Fred L. Brady?

By the defendant: Yes.

Court: You are represented by Charles Quier, an attorney of this city?

Defendant: Yes.

Court: He has conferred with you since he was appointed the other day to represent you?

Defendant: Yes.

Court: Are you willing at this time to waive formal arraignment, that is, the reading of the entire information wherein the charge against you is stated? Are you willing to waive that formal arraignment and are you ready to plead one way or the other in this matter at this time?

Mr. Herlocker: I would like for the court to read the information.

By the court: I will read it: 'State of Kansas, plaintiff, vs. Fred L. Brady, defendant. No. 5023. Information. Comes now John A. Herlocker, county attorney of Cowley county, Kansas, and gives the court to understand and be informed, That on the —— day of January, 1943, in the county of Cowley and state of Kansas, the defendant Fred L. Brady did then and there unlawfully, feloniously, willfully, deliberately, premeditatedly and with malice aforethought kill and murder one Joe Williams, then and there being, by shooting him the said Joe Williams with a certain loaded 22 caliber rifle, which the said Fred L.

Brady then and there in his hands had and held, while and at which said time the said Fred L. Brady was perpetrating or attempting to perpetrate a robbery upon the person of said Joe Williams; contrary to the form of statutes in such cases made and provided and against the peace and dignity of the state of Kansas—John A. Herlocker, County Attorney. (Verification here shown.)'

.By the court: You have heard me read the information. Are you ready Mr. Brady to enter a plea one way or the other in this case?

Defendant: Yes, sir.

Court: How do you plead, after consulting with counsel and going over the matter with him? Do you plead guilty, or not guilty?

By the defendant: Guilty.

By the court: I understand there is a recent statute in these matters, that the court should hear some evidence after the entering of the plea of guilty to determine what the punishment should be, what penalty should be imposed. So the court will proceed to hear evidence along that line.

By Mr. Herlocker: The state is ready at this time to introduce evidence.

By the court: Mr. Brady, or Mr. Quier, is there any reason why the court should not proceed to hear evidence in order to determine what the penalty and sentence should be?

Mr. Quier: None.

Mr. Brady: No."

We summarize the testimony thereupon received. Jesse Dickey, who lived on the same street and about two blocks south of Joe Williams, testified that on the evening of January 9 he was on the front porch of his house about ten or ten-thirty o'clock and saw a man in the street or in the edge of his yard in front of his house carrying "a long gun." He identified the defendant as the man he saw carrying the gun and saw at the police station the next day. Jesse Rindt, a funeral director, Lester Richardson, chief of police of Arkansas City, Marshall Morris, funeral director and county coroner, Iva Barkley, who had had many years of experience as a stenographer, and Joe Anderson, an experienced operative connected with the Kansas Bureau of Investigation, were called as witnesses by the state. The defendant called no witnesses. The state introduced a transcript of the statement made, under oath, by the defendant following his arrest and in the presence of the county attorney, the deputy county attorney, Mr. Anderson, George Wiley, and Iva Barkley. In this statement the defendant narrated fully and freely the facts incident to the commission of the crime and the circumstances leading up to it, and facts relative to prior convictions for other crimes. He stated that he was forty-six years old, that he knew the persons in whose presence the statement was being made; that no threats or force or promise of lieniency had been

made or used in order to get him to make the statement; that he had not been abused in any way by any of the officers; that the statement was being made voluntarily and with the understanding that anything he might say might be used against him; that he had lived in Arkansas City since the 18th day of January, 1941; that he had worked at various jobs in and around Arkansas City during that time; that he was arrested on the morning of January 10, 1943, at Burkey's Bakery in Arkansas City; that he had never really become acquainted with Joe Williams but first found out who he was about four or five months prior thereto; that he knew him and could recognize him on sight; that about eight o'clock on the evening of January 9 he was over on Sixth street in Arkansas City and was dressed at that time in the same clothes he had on when he was making the statement; that he went to Sixth street from the rooming house in Arkansas City where he was living, and that he took with him a .22 rifle which he had had for three weeks; that the rifle was loaded and he had a number of extra shots with him; that he went over there to rob Joe Williams; that he had heard it rumored that Joe Williams carried large sums of money on his person, and that he heard this when he was standing on the bank corner one evening when Joe Williams passed, and a colored man, also standing there on the corner, said, "That nigger carries the biggest roll of money in town"; that he had heard two or three make a similar remark concerning Joe Williams; that he went to Joe Williams' house; that there were no lights there and he concluded that Joe Williams was not at home, so he went farther on north and played a game of pool at a pool hall frequented by colored people; that there were eight or ten of them in there at the time; that he had a drink of whisky at that time; that he had hid the rifle in the grass not far from Joe Williams' home; that he remained in the pool hall and that about nine-thirty or a quarter to ten he left and went back to Joe Williams' house and hid behind a tree waiting for him to come home; that he had seen him sitting in a barber shop when he was on his way to the pool hall and after he had been in the pool hall; that as he hid behind the tree he had the gun with him, that it was loaded, that the gun was a pump gun and after a shot had been fired another could be pumped into the barrel; that he waited behind the tree until around eleven or eleven fifteen o'clock; that finally Joe Williams appeared, walked up on the porch and started to unlock the door; that he walked behind him and tried to

grab him and tried to hit him with the gun; that Joe Williams ran off the porch and he shot him just as he stepped off the porch and while he was running away from him; that he didn't see anything in Joe Williams' hand except the door key, and that Joe Williams did not have any weapon; that when he fired the shot he was standing just inside the door on the porch, about eight feet from Joe Williams; that he shot him in the lower part of the back; that after Joe Williams was shot he continued running; that he did not search him for any money due to the fact that he was still running; that he did not try to follow him because he did not know where he was going and "thought he might lead me into some peoples' house or into other people" and he did not want to be discovered; that he did not remember that Joe Williams said anything but simply remembered that he cried out saying "oh" when he shot him; that after he fired the shot he ran to the corner of the house and then west to the railroad track and on down to the river and threw the gun in the river; that he then went back to his room and stayed there the rest of the night; that when he fired the shot he was wearing the shoes which Mr. Anderson subsequently took from him and which he was again wearing at the time he made the statement. He also stated that he was familiar with the procedure of courts, having been in prison four times previously. We will make later reference to these prior offenses.

Testimony was given by the other witnesses above named that Joe Williams was found lying in the street in a pool of blood; that he may have been alive at the time he was found but that he was dead at the time or soon after he was taken to the hospital in an ambulance; that about seventeen hundred dollars was found on his person; that the bullet which struck him in the back went entirely through his chest and that it fell out of his clothing when the body was being examined at the mortuary, where it was taken after the doctor had been called and examined the body at the hospital; that the defendant had a wife but stated to the chief of police that he had been separated from her since December 1, 1942, and that he had no children; that he had been arrested twice before in Cowley county and served time in the county jail for stealing a battery; that officers making an investigation at the scene of the crime found foot tracks and could trace the steps of Joe Williams where he had run around the house, back of the house, and into the alley; that they also found tracks of another person and that an examination

of these tracks showed that they were made by the shoes worn by the defendant; that the defendant made a subsequent statement in which he said he did not throw the gun into the river but that he threw it into the weeds, and the officers subsequently found it at the place where the defendant said he had thrown it.

Following the introduction of appellant's statement to the officers appellant was examined at some length by the court. We quote the following excerpts from that examination:

"By the Court: You are not required to testify at this time unless you want to. You understand that rule of law, do you not?

Mr. Brady: Yes.

By the Court: I want to ask a few questions.

Questions by the Court. Answers by defendant Brady.

Q. In your statement which it is claimed you made you told about certain other trouble you had and the time you had served in different penal institutions. Were those correct statements of your former trouble? A. Yes.

Q. That is, the statements and answers you gave? A. Yes.

Q. They were correct as to the former times you had served? A. Yes.

Q. As I recall, that was in the state penitentiary of Arkansas, the state penitentiary of Missouri, the state penitentiary of Nebraska—those three? A. Yes.

Q. And some other in Kansas City? A. In Kansas, yes.

Q. Those four? A. Yes.

By the Court: Mr. Quier, are there any witnesses or anything you care to present?·

Mr. Quier: No.

By the Court: Is there anything else Mr. Herlocker?

Mr. Herlocker: Not unless the Court desires more evidence.

By the Court (resuming the questioning of the defendant Brady): Mr. Brady, the sentence you received in the state of Arkansas, that was on a grand larceny charge I take it from this statement? A. Yes.

Q. What were you found guilty of stealing down there? A. A bicycle.

Q. A bicycle? A. Yes.

Q. The next time was in Missouri, where you served five years for attempted robbery? A. Yes.

Q. Was that with a gun? A. Yes, sir.

Q. Then you were sentenced in Nebraska for robbery? A. Yes.

Q. That was with firearms? A. Yes, sir.

Q. As I understand this statement, the charge in Kansas City, Kansas, Wyandotte county, was for smuggling a pistol into the jail? A. Yes.

Q. Was that the county jail or city jail? A. County jail.

Q. You were not a prisoner in the jail at the time? A. No.

Q. It was for taking it in to someone else? A. Yes.

Q. You served your complete sentence for that offense in the Kansas penitentiary. Is that right? A. I was sentenced to life but got it commuted to 20 years, and served the full 20 years.

Q. You say twelve years. A. With good time off I completed the sentence.

Q. I see. As I stated, you are not required to answer these questions, but in determining the sentence the Court is interested, if you care to tell me about some of these matters."

The court then interrogated the appellant concerning the time of his marriage, how long he had lived in Arkansas City, what he had done while in that county, and other incidental matters. Following this examination of appellant by the court the following transpired:

"By the Court: After hearing this evidence, the Court inquires of counsel and Mr. Brady if there is any reason why sentence should not be pronounced at this time.

Mr. Quier: I know of none.

Mr. Brady: No.

By the Court: It will be the sentence of the Court that the defendant shall be punished by death."

The trial court later fixed 6 a. m. of March 20, 1943, as the time when the death sentence should be carried out and the record reads as follows:

"By the Court: The Court orders that the Clerk of this Court, being the Court and Clerk before which said plea of guilty was entered, shall issue a warrant under the seal of this Court, and which shall recite in it that said plea of guilty was received by the Court, and that evidence was introduced by the State and that death sentence was pronounced; and such warrant of the Clerk shall be directed to the warden of the State penitentiary at Lansing, commanding him to proceed at 6 a. m. on the 20th day of March, 1943, to carry the death sentence into effect, by causing Fred L. Brady to be hanged by the neck until he is dead; the Clerk shall deliver the warrant to the sheriff. of Cowley County, Kansas, being the county in which the plea of guilty was entered; and said sheriff shall thereupon forthwith remove Fred L. Brady to the State penitentiary of Kansas, located at Lansing, Kansas, and there deliver him, together with this warrant from the Clerk of this Court, into the custody of the warden of said penitentiary, who shall receive said Fred L. Brady and there safely keep him within the penitentiary until the time of execution, or until otherwise ordered by competent authority."

The journal entry, to which no exceptions were taken, appears to be complete in every detail, reciting among other things that the defendant entered his plea of guilty to the crime of murder in the first degree as charged in the information and as defined in G. S. 1935, 21-401; that following the plea of guilty testimony was taken by the court in compliance with G. S. 1941 Supp. 21-403. No request was made by the defendant or his counsel to withdraw the plea of guilty. Motion for a new trial was made. The motion was duly argued by counsel and overruled by the court January 15, 1943. This appeal followed.

We first take note briefly of the state's contention that the appeal is not properly before this court for the reason that the appellant "is attempting to appeal, not from the judgment but from the execution thereof." We need not extend this opinion by a discussion of that question. The fixing of the time by the trial court for the execution of the defendant was incorporated in the judgment and sentence from which the appeal was taken and we shall consider the appeal upon its merits.

It is not contended that the crime committed does not constitute murder in the first degree, nor that there was any irregularity in the proceedings under the statutes, nor that the appellant was denied a fair trial. Section 21-401, *supra*, provides:

"Every murder which shall be committed by means of poison or by lying in wait, or by any kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or an attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree."

At this point it should be noted that in the argument upon the appeal before this court counsel for appellant stated that in his consultation with the appellant prior to the entering of the plea of guilty he advised him that if he pleaded guilty the trial court had the authority either to sentence him to life imprisonment or to impose the death penalty.

It is not now contended that the trial court did not have power to impose a sentence of death. In oral argument appellant's counsel frankly conceded that the court had that power. The contention is simply that such a sentence becomes inoperative for the reason that (a) there is no applicable procedural statute for carrying it into effect, and that (b) there is no statutory provision empowering the trial court to fix the date for executing the death penalty.

For some years prior to 1907 the death penalty could lawfully be imposed in this state for murder in the first degree. In 1907 the death penalty for murder was abolished. (Laws 1907, ch. 188.) The legislature did not, however, then repeal and has not since repealed the statutes under which the death penalty may be imposed for two other offenses. Under statutes dating back to 1868, the death penalty may also be imposed for treason (G. S. 1935, 21-201) and "for perjury committed on the trial of any indictment for a capital offense with an express, premeditated design to effect the condemnation and execution of the prisoner," etc. (G. S. 1935, 21-702).

In 1935 an alternative death penalty for first-degree murder was restored (G. S. 1935, 21-403). The statute only applied, however, to cases where the defendant had been convicted by a jury. Under it the jury decided whether death or life imprisonment would be imposed. The same legislature also enacted a separate statute (Laws 1935, ch. 155, sec. 12) procedural in character, which was incorporated into our code of criminal procedure and which provides the method for carrying the death penalty into effect (G. S. 1935, 62-2412). It clearly applies not only to the crime of first-degree murder, but also to the other capital offenses heretofore named. The statute reads as follows:

"Whenever any person has been tried and convicted before any district court in this state of a crime punishable by death, and under said conviction has been sentenced by said court to suffer death, it shall be the duty of the clerk of the court before which said conviction was had to issue his warrant, under the seal of said court, reciting therein said conviction and sentence, directed to the warden of the penitentiary, commanding him to proceed *at the time named in said sentence* to carry the same into execution by causing the person so convicted and sentenced to be hanged by the neck until dead; the clerk shall deliver the warrant to the sheriff of the county in which conviction was had, and such sheriff shall thereupon forthwith remove such convicted person to the penitentiary of the state, and there deliver him, together with said warrant, into the custody of the warden, who shall receive and safely keep such convict, within the penitentiary until the time of execution, or until otherwise ordered by competent authority." (Italics supplied.)

In 1937 the legislature amended section 21-403, *supra*, by providing for death or life imprisonment in the case of first-degree murder, not only after conviction by a jury but after a plea of guilty (G. S. 1941 Supp. 21-403). It did not amend the procedural statute. (§ 62-2412, *supra*.) Section 21-403, under which the appellant was sentenced, now reads:

"Every person convicted of murder in the first degree shall be punished by death, or by confinement and hard labor in the penitentiary of the state of Kansas for life. If there is a jury trial the jury shall determine which punishment shall be inflicted. *If there is a plea of guilty the court shall determine which punishment shall be inflicted, and in doing so shall hear evidence: Pro-vided,* That the death penalty shall not be inflicted, either by the jury or by the court, upon any person who was under the age of eighteen years at the time the crime was committed. Those convicted of murder in the second degree shall be punished by confinement and hard labor for not less than ten years." (Italics supplied.)

The gist of appellant's contention is, first, that when the procedural statute (62-2412) was enacted in 1935 the legislature had in

mind only cases in which there was conviction after trial by jury, and that therefore it should not be held applicable to punishment imposed under the later statute after a plea of guilty; and second, that the words "tried and convicted" used in the procedural statute refer only to trial and conviction by a jury. Neither contention is persuasive. The procedural statute is broad in its terms, applying to all cases where the death penalty may be imposed, and there was no need or reason for its amendment in 1937 when the legislature amended the substantive statute, 21-403. The familiar doctrine that laws *pari materia* must be construed with reference to each other does not, as argued by appellant, support his contention that the procedural statute, 62-2412, can only be construed as relating to the original substantive statute, 21-403, enacted at the same session of the legislature. By its terms it applies to all cases where the death penalty is lawfully imposed. When section 21-403 was amended to include the death penalty after plea of guilty the procedural statute, 62-2412, continued *pari materia* with the amended section. There is no reason to believe that the legislature intended otherwise.

Appellant next argues that the words "tried and convicted" used in 62-2412 apply only to trial and conviction by jury and not to cases where the defendant pleads guilty. Neither reason nor the authorities support that narrow interpretation of the terms. Unless a different meaning is imported by the context or indicated by the particular matter to which it relates the word "trial" means—under broad definition generally recognized—the judicial examination and decision of matters at issue before a competent tribunal (64 C: J. 32). In our code of civil procedure a "trial" is defined as "a judicial examination of the issues, whether of law or fact, in an action" (G. S. 1935, 60-2901). An action is either civil or criminal (G. S. 1935, 60-106). Certainly it could not be seriously contended that one who had pleaded guilty and had been sentenced in a criminal action lawfully conducted had not had a "trial" or had not been "tried" simply because he had entered a plea of guilty. Likewise, under our own holding in the early case of *State v. Woodward* (7 Kan. App., 421), and under similar decisions in many jurisdictions the term "conviction" applies equally in cases where a plea of guilty has been entered and where there has been a verdict of guilty. (*Commonwealth v. McDermott*, 224 Pa. 363, 73 Atl. 427; *Smith v. Thomas*, 149 N. C. 100, 101, 62 S. E. 772, 773; *State v. Redman*, 183

Ind. 332, 341, 109 N. E. 184, 188; *State v. Almy,* 67 N. H. 274, 28 Atl. 372; *State v. Knowles,* 98 Me. 429, 57 Atl. 588; *Munkley v. Hoyt,* 179 Mass. 108, 60 N. E. 413; *Marx v. People,* 204 Ill. 248, 250, 68 N. E. 436, 437; *U. S. v. Hartwell,* Fed. Cas. No. 15,318, 3 Clifford 221, 232.)

In *State v. Woodward,* supra, a contention similar to the one here made was dismissed with the observation that "the defendants were 'convicted' by their own pleas."

We come to appellant's contention that the sentence is inoperative because there is no statutory provision clothing the trial court with power to fix a date for execution. Here, again, we find the contention untenable. In the first place, it is well settled that courts have inherent powers—perhaps not so broad in criminal as in civil matters—to effectuate the functions and duties imposed upon them (14 Am. Jur. 370, 373). In what may perhaps be regarded as an extreme application of that principle the United States Supreme Court held in the case of *Wilkerson v. Utah,* 99 U. S. 130, 25 L. Ed. 345, that the Utah court had power to determine the *method* of inflicting the death penalty, although the procedural statute prescribing the manner of carrying out death penalties had been repealed and there remained only a very general code provision in any way applicable. In *Keith v. State,* 157 Ind. 376, 388, it was said:

"It is unnecessary to decide whether or not the failure of the act of 1897 to prescribe when, where, how and by whom death sentences should be executed, impliedly repealed that part of the act of 1889 which did name the time, place, manner and officer, because the *express repeal of all legislation touching time, place, manner and officer would not abrogate the death penalty for murder, but would merely leave the court free to follow the common law in directing the execution of the sentence.*" (Italics supplied.) (p. 388.)

However, we need not and do not rest our conclusion on the instant issue upon any inherent power residing in the trial court. While the pertinent statute ("Execution of Death Sentences," G. S. 1935, 62-2401 to 62-2416) contains no specific provision directing the trial court to fix the date of execution, the intention to clothe the court with that power is made clear by many provisions. In section 62-2405 it is provided that "whenever the warden shall inflict the punishment of death upon a convict, *in obedience to the command of the court,*" etc. (italics supplied). Obviously a date for the execution is included, by necessary implication, within the phrase "in obedience to the command of the court." Again, section 62-2407 provides:

"In case said judge has suspended the execution of said convict pending an investigation as to his sanity, and said convict shall be found to be sane, *said judge shall appoint a day for his execution, which shall be carried into effect in the same manner as provided in the original sentence,* a certified copy of which shall be transmitted by mail to the executioner." (Italics supplied.)

Again, section 62-2410 provides:

"If the commission shall find that said female convict is with child, said judge shall suspend the execution of her sentence. At such time as it shall be determined that such woman is no longer pregnant, *said judge shall appoint a time for her execution, which shall be carried into effect in the same manner as provided in the original sentence."* (Italics supplied.)

Again, section 62-2411 provides the procedure to be followed in case a prisoner sentenced to death escapes and is not retaken *"before the time fixed for his execution."* That the time for the execution is to be fixed in the first instance by the trial court is further made evident by section 62-2412, which provides:

"Whenever any person has been tried and convicted before any district court in this state of a crime punishable by death, and under said conviction has been sentenced by said court to suffer death, it shall be the duty of the clerk of the court before which said conviction was had to issue his warrant, under the seal of said court, reciting therein said conviction and sentence, directed to the warden of the penitentiary, *commanding him to proceed at the time named in said sentence* to carry the same into execution by causing the person so convicted and sentenced to be hanged by the neck until dead," etc. (Italics supplied.)

Of similar import are the words used in section 62-2413 which is, in part, as follows:

"It shall be the duty of the warden of the penitentiary, on receipt of such warrant, provided the sentence has not been suspended as by law provided, and provided the governor shall not have commuted such sentence, or granted a reprieve or pardon to such convict, to proceed *at the time named in said warrant* to carry said sentence into execution in the manner herein provided." (Italics supplied.)

The trial court fixed March 20, 1943, at 6:00 a. m., which was more than sixty days thereafter. The conclusion is inescapable that in doing so it acted within its powers.

Appeal having been taken to this court the execution of the sentence was suspended by this court under the provisions of section 62-2414, which further provides that when the sentence has been so suspended "the suspension shall continue until the proceedings are determined, and after determining the same, if the sentence be confirmed, *said court shall appoint a day certain for and order the*

*execution of said sentence,*" and that "it shall be the duty of the clerk of said court to issue to said warden his warrant under the seal of said court, commanding him to proceed to carry said sentence into execution *at the time so appointed by the court, which time shall be stated in said warrant,*" etc. It follows that even if there were force in appellant's contention that the trial court was without power to fix the date of execution, the matter is now in the hands of this court, which has not only the power but the unpleasant duty of doing so.

Courts are not arbiters of public policy. We are not here dealing with any of the considerations, governmental, sociological, or religious, with which the age-old issue of capital punishment is freighted. Whatever views any of us may entertain on those matters, we are here limited both by law and conscience to the judicial function of faithfully interpreting and applying the law as we find it. We cannot unsurp either the legislative power of establishing public policy or the executive power of exercising clemency.

No error being found, the judgment must be affirmed. It is so ordered.