No. 43,020

Lowell Lee Andrews, *Appellant*, v. Tracy A. Hand, Warden, Kansas State Penitentiary, Lansing, Kansas, *Appellee*.

(372 P. 2d 559)

Opinion filed June 9, 1962.

*James R. Ahrens* and *Richard C. Allen*, of Topeka, argued the cause, and *Buford Braly* and *Harry Hayward*, of Kansas City, were with them on the briefs for Appellant.

*J. Richard Foth*, Assistant Attorney General, of Topeka, argued the cause, and *William M. Ferguson*, Attorney General, *Park McGee*, Assistant Attorney General, and *Robert J. Foster*, Special Assistant Attorney General, all of Topeka, were with him on the briefs for Appellee.

The opinion of the court was delivered by

Fatzer, J.: This was a proceeding in habeas corpus. The petitioner-appellant is confined in the Kansas State Penitentiary pursuant to a sentence of death imposed by the district court of Wyandotte County on January 18, 1960, upon conviction by a jury on three separate counts of murder in the first degree for the premeditated killing of his father, mother and sister on November 29, 1958. Following denial of his motion for a new trial, the petitioner appealed to this court which affirmed the judgment of conviction on December 10, 1960. (*State v. Andrews*, 187 Kan. 458, 357 P. 2d 739.) A motion for a rehearing was denied on January 25, 1961, and pursuant to G. S. 1949, 62-2414, this court entered its order directing that the death sentence be carried out on March 9, 1961.

Thereafter, application was made to the governor for a commutation of the death sentence to life imprisonment pursuant to G. S. 1949, 62-2220, which was denied on March 6, 1961. The following day, a petition for a writ of habeas corpus was filed in the United States District Court for the District of Kansas. (*Andrews v. Hand*, No. 3187 H. C.) The writ was issued that day, and an order staying execution was served upon the warden. The petition was set for hearing on March.16, 1961. At that hearing the United States

District Court entered its order retaining jurisdiction of the body of the petitioner to grant counsel time in which to apply to the Supreme Court of the United States for a writ of *certiorari.* Such an application was sought and denied on October 9, 1961. (*Andrews, Petitioner, v. Kansas,* 368 U. S. 868, 7 L. Ed. 2d 65, 82 S. Ct. 80.) On November 8, 1961, the United States District Court dissolved the stay of execution, and on that same date the petitioner commenced this action in the district court of Leavenworth County. (*Andrews v. Hand,* No. 1361 H. C.) A writ of habeas corpus was issued, and a hearing was held on November 21, 1961. Following an adjournment, the hearing was concluded on December 4, 1961, and the matter was taken under advisement. On December 18, 1961, the district court entered an order discharging the writ and remanding the petitioner to the custody of the respondent. The petitioner duly perfected this appeal.

As preliminary to discussing the merits of this appeal, we note that a petitioner who is confined in the Kansas State Penitentiary and who seeks a writ of habeas corpus in the district court of Leavenworth County and the writ is denied, may, as a matter of right, appeal to this court from the judgment discharging the writ by complying with the adequate and easily complied-with method of appeal (G. S. 1949, 60-3303, 3306), but the statute does not contemplate that he is entitled to a review of every matter involved in the trial in the district court without complying with well-established rules of procedure relating to appellate review. (*State v. Hamilton,* 185 Kan. 101, 103, 340 P. 2d 390; *State v. Burnett,* 189 Kan. 31, 33, 367 P. 2d 67; *Brown v. Allen,* 344 U. S. 443, 97 L. Ed. 469, 503, 73 S. Ct. 397.)

In the instant case the petitioner has wholly failed to comply with G. S. 1949, 60-3001, *et seq.,* relating to the filing of a motion for a new trial. Before an appellant may obtain appellate review of alleged trial errors, such as the sufficiency of the evidence to support the judgment discharging the writ of habeas corpus, or other errors alleged to have occurred during the course of the trial, a motion for a new trial is required to be filed calling the district court's attention to those specific matters, and the motion be overruled. (*Marshall v. Bailey,* 183 Kan. 310, 327 P. 2d 1034; *State v. Hickock & Smith,* 188 Kan. 473, 363 P. 2d 541.) In the absence of such a motion, alleged trial errors are not open to appellate review (*Russell v. Phoenix Assurance Co.,* 188 Kan. 424, 362 P. 2d 430), and inquiry

will not be made as to whether the evidence supports the findings of fact. (*Jeffers v. Jeffers,* 181 Kan. 515, 313 P. 2d 233; *Andrews v. Hein,* 183 Kan. 751, 332 P. 2d 278; *Barclay v. Mitchum,* 186 Kan. 463, 350 P. 2d 1109.)

Attention must be directed to another point. In the instant case, the petitioner did not prepare and file an abstract of the evidence introduced at the trial, but he filed a "Statement of Appellant Relating to the Incorporation of the Abstract in this case Directly into the Brief." Counsel certified that all of the material which was referred to and quoted in the brief was admitted into evidence at the trial, and reference to the record which is abstracted in the brief consists of the following: Four volumes of the certified transcript of the trial had in the district court of Wyandotte County; the petitioner's abstract on appeal to this court in *State v. Andrews,* supra; one volume of the certified transcript of the proceedings had in the United States District Court for the District of Kansas (*Andrews v. Hand,* 3187 H. C.); the depositions of Drs. Richard F. Schneider and William F. Roth taken in Kansas City and introduced in evidence in the district court, and the certified transcript of the proceedings had in the petitioner's trial below. In preparing his abstract, the petitioner failed to comply with Rule No. 5 of this court (188 Kan. XXVII; G. S. 1949, 60-3826) requiring that the party seeking appellate review of a district court's order or judgment shall include in his abstract specifications of error of which he complains, separately set forth and numbered. Where an appellant has made no attempt to comply with the requirements of Rule No. 5, appellate review is precluded and his appeal will be dismissed. (*Quick, Receiver v. Purcell,* 179 Kan. 319, 295 P. 2d 626; *Rice v. Hovey,* 180 Kan. 38, 299 P. 2d 45; *Blevins v. Daugherty,* 187 Kan. 257, 259, 356 P. 2d 852; *Lemon v. Pauls,* 189 Kan. 314, 369 P. 2d 355.)

Notwithstanding the petitioner failed to file a motion for a new trial raising the question of the sufficiency of the evidence to support the judgment and also failed to comply with Rule No. 5, this court will, in accordance with its fixed policy in appeals where the death penalty has been imposed and the district court's judgment of conviction is still in force, examine the record in a habeas corpus proceeding to determine the alleged illegality of a prisoner's restraint by the warden for any error affecting the substantial rights of the petitioner. (*State v. Woodard,* 7 Kan. App. 421, 53 Pac. 278; *State v. Brady,* 156 Kan. 831, 137 P. 2d 206; *State v. Miller,* 165 Kan.

228, 194 P. 2d 498; *State v. Miller,* 169 Kan. 1, 9, 217 P. 2d 287; *State v. Lammers,* 171 Kan. 668, 672, 237 P. 2d 410; *Germany v. Hudspeth,* 174 Kan. 1, 252 P. 2d 858; *State v. Andrews,* supra; *State v. Wilson,* 187 Kan. 486, 357 P. 2d 823; *State v. Hickock & Smith,* supra.)

We now turn to the merits of the appeal. The petitioner was eighteen years of age and was a very intelligent young man, he was in his second year of study at the University of Kansas. He lived with his father, mother and sister on a suburban farm in Wyandotte County. His sister was near his age and was attending a college in Oklahoma. Both were home for Thanksgiving vacation. The motive, plan, and the commission of the crimes for which the petitioner was convicted, and his designed efforts to establish an alibi and to point the finger of guilt at an unknown burglar, are detailed at length in this court's opinion in *State v. Andrews,* supra, and are incorporated in this opinion by reference. It is unnecessary to reiterate those facts, none of which the petitioner has ever denied.

However, in view of the petitioner's contentions, we note briefly the events which occurred in the early morning of November 29, 1958. At approximately 1:00 a. m. officers of the sheriff's patrol arrived at the petitioner's home following his call to the sheriff's office reporting the crimes. After arriving at the Andrews home and finding the dead bodies of the petitioner's father, mother and sister, they called for help. The officers talked to the petitioner about ten minutes before the assistant county attorney and the sheriff arrived. He denied any knowledge of the commission of the crimes and stated that the same must have been committed by a burglar. When informed that he would be given a paraffin test he stated he had discharged his rifle the previous afternoon when he attempted to shoot a hawk near the Andrews home. During the interview the petitioner wept on one or more occasions and did not appear unconcerned. When the assistant county attorney arrived the petitioner was not being questioned by any officers and he did not observe any further questioning except a question or two as to where the petitioner had been and when he discovered the bodies. The county coroner was called to come to the Andrews home, and he found the petitioner rather unconcerned about funeral arrangements for his family. Upon ascertaining the family were members of the Baptist Church of which the Reverend V. C. Dameron was the minister, he telephoned Reverend Dameron. After

completing the preliminary examination of the premises, the petitioner was taken into temporary custody. The assistant county attorney and the sheriff returned to the sheriff's office, arriving about 2:30 a. m. The petitioner was taken to the courthouse in Kansas City in a separate car. At that time, taking the petitioner before a magistrate was not discussed because the prosecutor had no indication that he had anything to do with the crimes. Shortly after the officers and the petitioner arrived at the sheriff's office they were joined by the Reverend Dameron. In response to the minister's request for a private interview with the petitioner, the assistant county attorney said:

"Yes, of course, he is not accused of anything and we certainly don't know whether he has had anything to do with this or not, but talk to him and any information he can tell us relative to this would certainly be helpful."

The minister conferred privately with the petitioner and asked him about the details of the day before, Thanksgiving, and whether he committed the crimes. The petitioner admitted to the minister that he had committed the crimes. The minister then advised petitioner that he did not have to make a statement to the investigating officials; that he was entitled to consult an attorney before talking to the officers, and that he (Reverend Dameron) knew some good lawyers in town and would be happy to get one to represent petitioner before he made any statement whatsoever. Also, that as his friend and minister he would stay with the petitioner and see that his rights were protected if he chose to make a statement to the officers. In response to that suggestion the petitioner stated he desired to make a statement at that time. The minister returned to the waiting room where the assistant county attorney and the officers were, and informed them the petitioner wished to make a statement. The assistant county attorney advised the petitioner of his constitutional rights and told him that he did not have to make any statement. However, upon being advised by the petitioner that he wished to make a statement, the assistant county attorney called a stenographer who arrived in about twenty minutes, during which time the petitioner was not interrogated. No one talked to him except the minister, although someone asked him if he would like some coffee and at his request the minister got him a coke.

After the stenographer arrived, the petitioner made a free and voluntary statement to the assistant county attorney in the presence of the minister and two detectives, that he had committed the three

murders.  His statement was transcribed by the stenographer, and read, initialed and signed by him in the presence of the minister and the officers.  After the petitioner made and signed the confession he was taken before a justice of the peace at approximately 4:00 a. m.  There, able and experienced counsel was appointed to represent him, who was one of the attorneys the petitioner later employed after being granted his rights of majority by the district court of Wyandotte County.

At the trial the petitioner's written confession was admitted into evidence without objection.  At no time during the trial did petitioner's able and experienced counsel intimate that the confession was anything but freely and voluntarily given.

The petitioner first contends it was denial of due process of law (1) for the district court to refuse to permit counsel to advise the jury on *voir dire* examination that in the event it found the petitioner not guilty by reason of insanity, the court would be required under Kansas law ( G. S. 1949, 62-1532) to commit him to the state hospital for the dangerous insane "for safekeeping and treatment," and (2) for the district court to refuse to instruct the jury on the lesser degrees of homicide.  The points are not well taken.  Both of the alleged errors were but elements of the trial, reviewable only on appeal.  Indeed, they were fully reviewed in *State v. Andrews,* supra; the first being considered at page 462, and the second at pages 464 and 465.

Few words are needed to restate the well-known rule of appellate practice that an application for a writ of habeas corpus will not be recognized as a substitute for a regular and timely appeal from a judgment and sentence in a criminal case, or, as here, to serve as a belated motion for a rehearing of a criminal appeal which has been regularly disposed of.  (G. S. 1949, 60-2213; *In re MacLean,* 147 Kan. 678, 78 P. 2d 855; *In re Light,* 147 Kan. 657, 78 P. 2d 23; *James v. Amrine,* 157 Kan. 397, 399, 140 P. 2d 362; *Stebens v. Hand,* 182 Kan. 304, 320 P. 2d 790; *Converse v. Hand,* 185 Kan. 112, 340 P. 2d 874.)

The petitioner's effort to inject a due process question into these two points must be regarded as wholly without merit.  In the respondent's brief the statement is made that when the petitioner sought review of *State v. Andrews,* supra, in the Supreme Court of the United States, he conceded in his petition for *certiorari* that no case has ever held that an instruction on lesser degrees of homicide

is required by due process. He cites none now. Neither does he cite any authority for the proposition that he is constitutionally entitled to advise the jury of the legal consequences of its verdict. It was the duty of the jury to determine the guilt or innocence of petitioner, and if it found him not guilty by reason of insanity to so declare. It was the duty of the district court to impose the proper sentence after the verdict had been reached. As held in *State v. Andrews,* supra, it was no concern of the jury what penalty attached to its verdict in the event it found the petitioner not guilty by reason of insanity. While the state was allowed to advise the jury that the penalty on the conviction of first degree murder would be life imprisonment or death, that was made so by reason of our statute (G. S. 1949, 21-403). The law is well settled that, in the event a defendant is found guilty by a jury of murder in the first degree, it is the duty of the jury, and the jury alone, to determine whether the death penalty or life imprisonment shall be inflicted. (*State v. Christensen,* 166 Kan. 152, 157, 199 P. 2d 475.)

Both of these are matters of state law on which this court is the final arbiter, and they were decided adversely to the petitioner in *State v. Andrews,* supra. It is within the power of the state to prescribe the method of procedure in the prosecution for violations of its criminal laws (*Bailey v. Hudspeth,* 164 Kan. 600, 603, 191 P. 2d 894), and it is immaterial whether those laws are a result of a statute or whether they are decisions of this court as to what is the law in Kansas. In *Brown v. New Jersey,* 175 U. S. 172, 44 L. Ed. 119, 20 S. Ct. 77, Mr. Justice Brewer said:

"The state has full control over the procedure in its courts, both in civil and criminal cases, subject only to the qualification that such procedure must not work a denial of fundamental rights or conflict with specific and applicable provisions of the Federal Constitution. . . . 'The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. . . .' *Missouri v. Lewis,* 101 U. S. 22, 31." (p. 175.)

This court is cognizant of the rule of the Supreme Court of the United States that, in considering claims of alleged violation of the Fourteenth Amendment, it takes "account of the large leeway which must be left to the states in their administration of their own criminal justice." (*Rogers v. Richmond,* 365 U. S. 534, 5 L. Ed. 2d 760, 770, 81 S. Ct. 735.) Where, as here, there was no fundamental right denied to the petitioner, we hold he was not denied due process of law on the grounds urged.

The petitioner next contends that the circumstances surrounding his arrest and his subsequent confession shocked the conscience and denied due process of law. He asserts that the principal items of evidence upon which his conviction and sentence of death were based were the testimony of the Reverend Dameron and the petitioner's confession which it is claimed, the minister induced him to make. It is urged that the petitioner's confession was not voluntary in light of his age and severe mental illness and the manner in which the confession was extracted from him.

In making the contention, the petitioner concedes that the presence of mental illness *per se* does not vitiate a confession, but argues that where the lack of mental capacity is present to the degree it was in petitioner, and where the circumstances surrounding the extraction of the statement were of the character here present, the statement was not voluntarily made. Cutting through the verbiage, it is claimed that the petitioner's confession was not a product of his free will and that he was unable to protect his interests from the "psychological coercion" resulting from the impact of the questioning by the Reverend Dameron.

The record indicates the petitioner gave at least three separate confessions. The first was orally made to the Reverend Dameron in a private conversation in the sheriff's office; the second was the formal written confession given to the assistant county attorney, and the third was made to petitioner's expert witness, Dr. Joseph Satten, during the course of his observation and examinations at the Menninger Clinic in Topeka. All three were substantially identical. In addition, petitioner readily elaborated on some details in subsequent conversations with the Reverend Dameron and discussed the crimes to some extent with members of the sanity commission, three eminent psychiatrists, appointed by the district court prior to the trial to determine the petitioner's sanity.

We think the petitioner's contention with respect to the confessions meets two unsurmountable obstacles. First, he has never and does not now deny commission of the crimes. At the trial he deliberately chose to let one confession in without objection and put in another himself. He cannot now be heard to say that his own trial tactics deprived him of due process of law. That was no implied waiver as suggested in petitioner's brief, but was a deliberate and conscious choice of his chosen counsel. Second, counsel's choice also goes far to show that there is no merit to petitioner's new-found

claim of "psychological coercion" which must stand or fall on the Reverend Dameron's conduct at a time it was alleged the petitioner suffered a mental illness to such a degree that the confessions could not have been voluntary. With respect to mental illness, the burden of proof was upon the petitioner to prove his mental incapacity to confess to the crimes, that is, his evidence must have preponderated to show that at the time of the commission of the crimes and at the time of making the confession he was incapable of distinguishing right from wrong so as to excuse him from the legal consequences of his acts. In other words, whether he had legal capacity to confess to the crimes is determined by the same standard that is applied in this state as to whether he had legal capacity to commit them. (*State v. Penry,* 189 Kan. 243, 245, 368 P. 2d 60.)

Coercion in obtaining a confession from an accused can be mental as well as physical. (*Payne v. Arkansas,* 356 U. S. 560, 2 L. Ed. 2d 975, 78 S. Ct. 844; *Spano v. New York,* 360 U. S. 315, 3 L. Ed. 1265, 79 S. Ct. 1202; *Blackburn v. Alabama,* 361 U. S. 199, 4 L. Ed. 2d 242, 80 S. Ct. 274.) The Fourteenth Amendment forbids "fundamental unfairness in the use of evidence, whether true or false" (*Lisenba v. California,* 314 U. S. 219, 236, 86 L. Ed. 166, 180, 62 S. Ct. 280), and the range of inquiry as to whether a confession was involuntarily obtained is broad. Whether a confession was freely or involuntarily given is based upon consideration of "the totality of the circumstances" (*Fikes v. Alabama,* 352 U. S. 191, 197, 1 L. Ed. 2d 246, 251, 77 S. Ct. 281), and "where there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." (*Blackburn v. Alabama,* supra.) It is this proposition upon which the respondent's principal argument rests, as the jury's verdict finding the petitioner guilty, and the judgment of the district court discharging the writ of habeas corpus, is said to be inviolable because of a genuine conflict in the evidence presented at both trials. It is urged that the findings inherent in each of those judgments were that the petitioner's confessions were free and voluntary and that he was not legally insane, and they compel an affirmance.

The following is a summary of the evidence introduced by the petitioner and the respondent: Dr. Richard F. Schneider, Dr. William F. Roth, Jr., and Dr. Merrill Eaton were appointed members of the sanity commission. Drs. Schneider and Roth testified on behalf of the state at the petitioner's trial and both testified in the court below by deposition. Dr. Roth testified that he regarded the

petitioner as having a schizoid personality, and reaffirmed his testimony at the trial, that the petitioner knew right from wrong and knew and appreciated the quality of his act at the time of the offenses. Dr. Schneider's testimony at both trials was that the petitioner was not insane, not psychotic, but was suffering from a schizoid personality when he was examined by the sanity commission in February of 1959; that he was competent to co-operate in his own defense and to clearly understand the charges which were brought against him; that a schizoid personality would not necessarily impair the accused's responsibility; that his mental condition was substantially the same during the summer of 1958 when he planned the murders as it was in February, 1959, when he was examined; that such a personality would not affect the petitioner's ability to give a free and voluntary confession a few hours after the commission of the crimes; that the petitioner was aware of the acts that he was committing at the time and knew and appreciated the nature and quality of them; that he knew there were laws against the acts he was committing and that he would be subject to punishment for the commission of those crimes, and that his schizoid personality would not prevent him from adhering to the law had he chosen to do so.

Dr. Eaton did not testify at the petitioner's trial, but he testified in the United States District Court and his testimony was admitted in evidence in the trial below. He, like Dr. Satten, diagnosed petitioner's condition as schizophrenic reaction, a type of psychosis, and that the mental illness would interfere materially with the ability of petitioner to exercise judgment and discretion and act in his own interests.

Dr. Joseph Satten, Senior Staff Psychiatrist at the Menninger Clinic, testified on behalf of the petitioner at his trial and also in the trial below that the petitioner was suffering from a mental illness described as schizophrenic reaction, simple type, at the time of his examinations at the clinic and at the time of the commission of the crimes and the giving of the confession, and that he was "not capable of making a voluntary statement at that time." However, he testified that the petitioner had an intellectual knowledge of what he was doing when he killed his family; that he was intellectually aware of the penalties for murder; that he could have told one on the night in question that if he eliminated the three deceased per-

sons, the petitioner would be the owner of the property they possessed; that the petitioner had related to the witness the different plans and methods which he had devised over a period of months for killing his mother, father and sister, including poison, arson, and shooting, and that the petitioner had disposed of his family in order to possess their wealth and then had devised a scheme to make it appear that the home had been burglarized and that the murders had been committed during the burglary.

Robert J. Foster, the then assistant county attorney and the present county attorney of Wyandotte County, testified on behalf of the respondent concerning the petitioner's arrest and the giving of the confession. He testified that when the petitioner gave the formal written statement he appeared to be in all respects normal and that there was nothing unusual about his statement as compared to many others he had taken as a prosecutor; that the petitioner answered the questions freely and voluntarily and did not seem at all reluctant about making a full statement concerning the commission of the crimes.

The Reverend Dameron testified for the state at the petitioner's trial in Wyandotte County, and also at the trial in the United States District Court. At the latter trial he reaffirmed the testimony given at the former trial. He testified he had been the minister of the Grandview Baptist Church in Kansas City, Kansas, for thirteen and a half years; that he and the petitioner's father had grown up on adjacent farms in Missouri and they were childhood friends; that he had known the petitioner's mother since her marriage some thirty years ago; that the petitioner's parents were active members in his church; that he had been acquainted with the petitioner during practically his entire lifetime and that he had visited in the Andrews home on many and numerous occasions and that the Andrews family had visited in his home many times; that he had conferred on numerous occasions with petitioner after his arrest; that he had asked him whether he considered any of their conversations as confidential; that he told petitioner if he considered any of their conferences as confidential or if he did not want him (Reverend Dameron) to testify to any of the matters talked about during their conferences, he would abide by the petitioner's decision; that the petitioner at all times stated he never considered their conferences as confidential, and that he could do whatever he pleased about testifying.

Out of the presence of the jury, the court asked the minister the following questions and the following answers were made:

"THE COURT: What were the circumstances under which the defendant confessed to you in the first place, Reverend, when you went into the room? REVEREND DAMERON: I went in there. I advised him I was there not only as his minister but as his friend. And we first talked about Thanksgiving, his vacation, and school, and a few remarks like that. And then I expressed my regrets at what had happened out there. And I sympathized with him and told him that I knew he was deeply concerned about what had happened and that he was just as anxious as I and others to find who were the guilty parties. And I said, 'Now, knowing you all your life, Lee, and your parents, I cannot believe that you had any part in this crime, but there is some question in the minds of the officers as to the fact that maybe you did have something to do with it, and I am sure that you wouldn't object to taking a lie detector test in order to establish your innocence so that the officers can get busy and find the guilty party.' And I said, 'Lee, you didn't do this, did you?' And then it was that he said he did. THE COURT: Is that all he said? REVEREND DAMERON: Well, I asked him why, and he told me the story. THE COURT: Did you feel that he was confessing to you as his minister and because of his relation to you or because of the discipline of the church? REVEREND DAMERON: There is no such discipline in the Baptist Church, that a member confesses to the minister his crime or wrong doing. He was seemingly purging his soul of what he had done, and he was talking to me not only as a minister but as a friend, almost a member of the family, in fact."

The minister further testified that, based on his experience as chaplain in the armed forces in counselling people with emotional and mental problems during his military service, he was of the opinion that the petitioner "was in complete charge of his faculties. He knew what he had done and why."

The petitioner's brief characterizes the Reverend Dameron as a "police interrogator" and as *"agent provocateur* . . . masquerading as a friend and a man of God" whose "cleverness" on the night in question was "more subtle than the blackjack or rubber hose, but infinitely more effective." The assertion is unsupported in fact and wholly unwarranted. An objective reading of the record indicates that he was present in the sheriff's office, not as a pretended friend, as the petitioner asserts, but as a friend who was almost a member of the family and who sought to give spiritual as well as moral comfort and assistance to a young man whose entire family had just been murdered. In no respect was the Reverend Dameron's conduct in violation of his professional and christian duties, nor did he breach his trust relationship with the petitioner. He stood by him as a friend. The record clearly demonstrates that he exerted no coercion, psychological or otherwise.

Giving the testimony of Dr. Satten the fullest credence, it is sufficient to observe that it is in internal conflict, and raises no genuine issue of fact when tested by the rule as to responsibility for criminal acts because of the defendant's alleged insanity (*State v. Andrews*, supra), and to make a confession of the commission of such offenses. (*State v. Penry*, supra.) While he testified that the petitioner was not capable of making a voluntary statement on the morning of November 29, he also testified that the petitioner had the mental capacity of understanding what he was doing and had the power to know that his acts were wrong. It would be unreasonable in the extreme to base a determination upon those portions of the testimony in which the doctor proclaimed the petitioner was insane and had no capacity to make a voluntary confession, and ignore those portions in which he testified the petitioner was responsible for his criminal acts when he killed his family but was incapable of confessing to those murders not more than an hour and a half later.

The cases cited and relied upon by the petitioner have been carefully examined, but each case displayed an oppressive, fraudulent and schematic method used by police officers in obtaining the confessions. They bear no semblance to the case at bar.

A judgment of conviction, especially where it has been carefully reviewed by this court on appeal and affirmed, carries with it a presumption of regularity (*Pyle v. Hudspeth*, 168 Kan. 705, 215 P. 2d 157), and where one convicted of a crime attacks such a judgment by habeas corpus proceedings on the ground that his constitutional rights were violated, he has the burden of proof to establish such fact by the preponderance of the evidence. (*Wilson v. Turner*, 168 Kan. 1, 208 P. 2d 846.)

The judgment of the district court of Leavenworth County was that the writ of habeas corpus be discharged. That was a general finding in favor of the respondent, and such a finding determined every controverted question of fact in support of which evidence was introduced. A general finding by a trial court raises a presumption that it found all facts necessary to sustain and support the judgment. (*Davis v. Davis*, 162 Kan. 701, 704, 178 P. 2d 1015; *Dryden v. Rogers*, 181 Kan. 154, 309 P. 2d 409), which will not be disturbed on appeal if there is substantial, though controverted, evidence to sustain it (*Stanley v. Stanley*, 131 Kan. 71, 289 Pac. 406; *Hale v. Ziegler*, 180 Kan. 249, 303 P. 2d 190; *Huebert v. Sappio*, 186 Kan.

740, 742, 352 P. 2d 939.)  Whatever conflict may be present in the evidence must be resolved in favor of the petitioner's sanity and his legal capacity to commit the crimes and to make a free and voluntary confession.  That is implicit in the judgment of the district court and there is ample substantial evidence to sustain the judgment.

The petitioner contends that the rule of criminal responsibility on which the district court instructed the jury, referred to as the M'Naghten rule, was so misleading that the jury could not make a fair evaluation and reach a result consistent with due process of law.  The effect of the contention is to once again ask this court to reconsider the rule of criminal responsibility in this state and to adopt a more "modern" rule.  This time the plea is made in the name of due process.  Were it not for the assertion of a purported constitutional issue, this court might well be content to refer to its exhaustive analysis of that argument in *State v. Andrews,* supra.  The evidence of mental illness and the alleged ambiguities in the words "know" and "wrong" were all before the court there, and this court chose to stand with M'Naghten.

The constitutional argument was fully answered by the Supreme Court of the United States in *Leland v. Oregon,* 343 U. S. 790, 800, 801, 96 L. Ed. 1302, 72 S. Ct. 1002, where, in the course of the opinion, Mr. Justice Clark said:

".  .  . Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions.  The science of psychiatry has made tremendous strides since that test was laid down in *M'Naghten's Case,* but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law.  Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility.  This whole problem has evoked wide disagreement among those who have studied it.  In these circumstances it is clear that adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty.' "  (pp. 800, 801.)

It may be conceded that this court could, at this time, if it so desired, abandon M'Naghten in favor of some other rule.  Since *State v. Andrews,* supra, in which this court was the battleground for "Durham" against "M'Naghten," the question has come up in several other jurisdictions.  The Third Circuit adopted a new rule in *United States v. Currens,* 290 F. 2d 751 (1961).  Elsewhere the judicial trend has been strictly pro-M'Naghten and anti-Durham.

In *State v. Crose,* 88 Ariz. 389, 357 P. 2d 136 (1960), it was said:

". . . We are under no illusions concerning the M'Naghten Rules. They do not provide a perfect test for criminal responsibility. They may not even provide a good one. They merely provide what we believe to be, in all the circumstances, still the best that is available. We decline to abandon them. . . ." (1. c. 394.)

In *Commonwealth v. Woodhouse, Appellant,* 401 Pa. 242, 164 A. 2d 98 (1960), it was said:

". . . Until some rule, other than 'M'Naghten,' based on a firm foundation in scientific fact for effective operation in the protection and security of society, is forthcoming, we shall adhere to it. We shall not blindly follow the opinion of psychiatric and medical experts and substitute for a legal principle which has proven durable and practicable for decades, vague rules that provide no positive standards. . . ." (1. c. 258, 259.)

In *Chase v. State,* _____ Alaska _____, 369 P. 2d 997 (1962) the M'Naghten rules were basically approved, and in the opinion it was said:

"We are not persuaded to adopt Durham in this jurisdiction. The 'disease-product' test has no real meaning to us, and we venture to say, would have none to jurors who would apply it to the facts nor to the judges who would frame instructions. The terms 'mental disease' and 'mental defect' are not defined, and hence they would mean in any particular case whatever the experts say they mean. A further difficulty is that the psychiatrists disagree on what is meant by 'mental disease,' or even if there is any such thing. We shall not impose upon the trial courts and jurors the formidable, if not impossible task of understanding and applying terms whose meaning is unclear to acknowledged experts."

See, also, *State v. Bannister* (Mo. 1960), 339 S. W. 2d 281, and *State v. Jefferds,* 89 R. I. 272, 162 A. 2d 436 (1960).

The list is not intended to be exhaustive, but it serves as an apt illustration that if the application of M'Naghten violates due process, such violations are occurring in many areas of the country.

The Durham opinion (*Durham v. United States,* 214 F. 2d 862, 45 A. L. R. 2d 1430) determining criminal responsibility has created considerable debate. It represents a departure by the Court of Appeals for the District of Columbia from the previously existing "right and wrong" test based upon the M'Naghten rules, as modified by the irresistible impulse doctrine. But it has not been received with any universal acclaim, even in its own district. In the case of *Blocker v. United States,* 288 F. 2d 853 (1961), Judge Burger, in a separate opinion, thoroughly analyzed the whole subject of criminal responsibility. He pointed out that every court which had con-

sidered the "Durham" rule had rejected it: three Federal Courts of Appeal, the United States Court of Military Appeals, and the highest court of twenty states (see pp. 859, 860). The list of cases cited by Judge Burger did not include *Chase v. State,* supra; *State v. Bannister,* supra, and *State v. Jefferds,* supra. Moreover, the effect of the Durham rule was not limited to judicial consideration. The Durham case provoked congressional re-examination of federal laws of the District of Columbia relating to the commitment of the criminally insane. "Apprehension that *Durham* would result in a flood of acquittals by reason of insanity and fear that these defendants would be immediately set loose led to agitation for remedial legislation." See Krash, The Durham Rule and Judicial Administration of the Insanity Defense in the District of Columbia, 70 Yale L. J. 905, 941 (1961), cited in *Lynch v. Overholser* (May 21, 1962), 369 U. S. 705, 8 L. Ed. 2d 211, 82 S. Ct. 1063.

Without further discussion we deem it sufficient to say that at this stage of scientific knowledge of mental illness, due process of law does not impose upon the state of Kansas one test of mental irresponsibility for acts resulting in homicide rather than another, and thereby displace the state's own choice of M'Naghten no matter how backward that test may be in the light of the best psychiatric and medical knowledge. We hold that the due process clause of the Fourteenth Amendment does not require Kansas to eliminate the so-called M'Naghten or "right and wrong" test of insanity and adopt the "irresistible impulse" test or the so-called Durham rule that an accused is not criminally responsible if his unlawful act was "the product of mental disease or mental defect." (*Durham v. United States,* supra.)

The petitioner lastly contends that in any case in which evidence of mental illness is clear and where it appears that the offense charged has a direct relation to the illness, imposition of the death sentence should be struck down as opposed to the fundamental guaranties of the due process clause. The contention pre-supposes that the petitioner is insane by some legally recognizable criterion. At the trial below the petitioner failed to sustain the burden of proof on that point, and it was conclusively determined otherwise by the jury's verdict in Wyandotte County. Only if this court should now

vastly revise the legal definition of criminal responsibility could there be any merit in the claim. We decline to do so. While we are fully cognizant of the great difficulty in many cases of ascertaining the mental condition of an accused and of assessing its effect on a muscular contraction resulting in a homicide, we are of the opinion that the rule presently applicable in this jurisdiction is based upon a firm foundation for the protection and security of society, and until some better rule is forthcoming, we shall adhere to it.

The judgment is affirmed.