No. 47,535

THE STATE OF KANSAS, *Appellee,* v. MICHAEL DUANE PYLE, *Appellant.*

(532 P. 2d 1309)

Opinion filed March 1, 1975.

*Harold S. Herd,* of Coldwater, argued the cause and was on the brief for the appellant.

*Jack Focht,* special assistant county attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Douglas Brunson,* county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: Appellant Michael Duane ("Mike") Pyle was convicted by a jury of the first degree murder of his grandmother, Mrs. Golda ("Goldie") Millar, and of arson for the burning of her house.

Mrs. Millar was last seen by her customary associates on April 5, 1971. Her ranch home in Kiowa county, between Haviland and Belvidere, burned to the ground in the early morning hours of April 8, 1971. No one has seen or heard from her since, and no trace of her body has ever been found.

The absence of a body gives rise to two of appellant's contentions on appeal, namely, that the state failed to prove either the corpus delicti or the venue of the alleged murder. He also contends that a series of incriminating statements he made were improperly admitted, that he was precluded from making an insanity defense because of an erroneous ruling on the doctor-patient privilege, and that the court should have instructed on a lesser degree of homicide. To evaluate these contentions it is necessary to examine the state's evidence in some detail.

### Background

Goldie Millar was 78 when she disappeared. She owned a 3100 acre ranch near Belvidere, worth more than $340,000. She had two daughters, Mrs. Lois Allen of Hampton, Virginia, and Mrs. Billie Kratzer of Colorado Springs, Colorado. Mrs. Kratzer was the mother by a former marriage of the appellant Michael Pyle.

Mike had been a troubled child, presenting discipline problems punctuated by aggressive assaults on younger boys, including his brother. The result was a referral at the age of twelve to The Menninger Foundation at Topeka for a psychiatric evaluation, followed shortly by five years at a military academy. Attempts at higher education were failures, and in 1964 or 1965 he went to live with his grandmother Goldie on her ranch. Relations between them were harmonious for several years; in 1967 Goldie made a will in which she left the bulk of her estate to Mike, including the ranch. In 1968 Mike married Linda Clarkson, and he and his wife

went to live on the ranch. It appears that some hostility soon developed between Goldie and the new bride.

In 1969 relations between Mike and his grandmother also began to deteriorate. That summer he beat her, cutting her lip and bruising her arms. In July of that year Goldie withdrew her will from the probate court where it had been deposited, took it to her lawyer's office, and there revoked it by tearing off her signature. As it later developed, Mike was unaware of the revocation and in April, 1971, still thought he was her primary beneficiary.

In August, 1969, Mike administered yet another beating to her, and later that month she was forced to call the sheriff to quell a violent argument between herself and Mike and Linda. At that time the sheriff suggested that the young people should leave the ranch. Mike agreed, but told the sheriff as he left, "This is my ranch and I am going to have it, one way or the other."

In 1969 Mike sought to enlist the aid of his aunt, Lois Allen, to have Goldie declared incompetent so that he could gain control of the ranch. He already had a power of attorney. Her response was to call her mother, Goldie, and urge that she revoke the power of attorney. Goldie said she would.

Over the fall and winter of 1969-70 matters became progressively worse. On one occasion Mike removed some tools and other property from the ranch, and Goldie wanted to prosecute him for theft. The sheriff and county attorney mediated the dispute. On another occasion, Mike attempted to remove a water pump from the ranch. Goldie called the undersheriff, who came out and persuaded him to reinstall it.

In the spring of 1970 Goldie suffered a slight stroke. Mrs. Allen came from Virginia to be with her mother, and discovered that Mike's power of attorney was still outstanding. She took Goldie to a lawyer where a formal revocation was prepared and Goldie executed it. Mrs. Allen had told Mike she would have no part of his plan to have Goldie committed.

In 1970 Mike sued Goldie on a note.

That October Goldie entered into negotiations with Alfred Barby, of Meade, to sell him the ranch. They agreed on a price of $110 an acre for a little more than 3100 acres and had contract papers prepared, but at the last minute she backed out. Instead, in November she leased the land for two-and-a-half years at $4 per acre per year. When she approached Barby again in December, 1970,

the proposition was less attractive to him because of the outstanding lease.

That is the way matters stood when the parties entered the fateful days of April, 1971. Goldie was at the ranch, wishing to sell. Mike and his wife, Linda, were living in Pratt, some thirty-odd miles away, but Mike still came to the ranch on occasion and still got some mail at Belvidere. Relations between Goldie and Mike were strained.

### The First Week of April, 1971

*Thursday, April 1:* Goldie went into Belvidere and picked up her mail. Belvidere is a town of some twenty persons, about two to three miles south and east of the ranch. There she visited with, among others, Geneva Braden, the postmistress, and Ellen Davis, keeper of the general store and gas station. She seemed fine to them. Both were longtime friends who saw Goldie at least every few days and sometimes every day. Neither has seen her since, although Geneva Braden talked to her on the telephone the next Monday.

*Friday, April 2:* Luther Lemon was on the ranch taking care of cattle for his employer, Stanley Dannebohm, who leased the 3100 acres of pasture. He saw Goldie standing in the yard talking to Dannebohm and his son, and later stopped and visited with her. He observed nothing unusual about her. He never saw her again.

*Saturday, April 3:* Dannebohm was at the ranch again. Goldie called him in the house and attempted to sell him the 3100 acres he was renting from her. At her asking figure of $123 per acre the price was too much for him to handle, and he told her so. He never saw or heard from her again.

That same evening Alfred Barby, who had almost bought the ranch before, was passing through Haviland and called Goldie to talk to her about it once more. They again agreed on a price of $110 per acre. Goldie wanted him to come to the ranch that night and give her $5,000 earnest money, but he demurred. It was late, they had no contract, she was just recovering from the flu, and he didn't want to tangle with her dog, who had "got a hold of" him a time or two before. He would call her within two weeks.

*Sunday, April 4:* This appears to have been a day of solitude for Goldie. No one reports seeing or talking to her.

*Monday, April 5:* Bill Hogan, Kiowa county sheriff, telephoned Goldie about 5:53 p. m. He had a Pratt county warrant for Mike's

arrest on bad check charges. He hadn't seen Mike for some time, and wondered if he was living at the ranch. Goldie told him Mike lived in Pratt, but she was expecting him that evening and would tell him to see the sheriff about the warrant.

Around 7:00 to 7:30 p. m. Mrs. Harley Septer telephoned Goldie to see about some materials Goldie was to furnish to fence off some cultivated land on the ranch. Mr. Septer was to do the fencing next day for Harlin Yost, who rented the cultivated land. Goldie told Mrs. Septer the material would be in the yard, and that if she wasn't in the yard when her husband arrived the next day he should not come in the house because she had a bad headache.

Around the same time Geneva Braden, the Belvidere postmistress, also called. Mike had telephoned from Haviland to see about picking up his mail, and Mrs. Braden wondered if Goldie would like him to get hers while he was there. Goldie said yes, she would appreciate that very much.

Those two calls, from Mrs. Septer and Mrs. Braden in the evening of Monday, April 5, represent the last contact with Goldie by anyone other than Mike. The balance of the tale must therefore focus on his activities.

Around 8:00 or 8:30 that Monday evening Mike appeared at the Belvidere post office and picked up his and Goldie's mail from Geneva Braden. Around 8:45 he burst into sheriff Hogan's house, visibly upset. He ignored Mrs. Hogan—an unusual thing for him to do—and demanded to talk to the sheriff. Mike said his grandmother had been drunk for three weeks and was vomiting blood. He had been having to go to the ranch twice a day to take care of the dog because she was in no condition to do so. When the sheriff asked him about the bad check charge, Mike said he had plenty of money to take care of it, but didn't want Goldie to know how much he had. He and sheriff Hogan agreed he would go to the Pratt county sheriff's office the next morning and take care of it, rather than submit to arrest in Kiowa county. Mike never kept that appointment.

*Tuesday, April 6:* Harley Septer went to the ranch looking for the fencing material Goldie had said would be laid out in the yard. He found no material, and saw no one around the place, so he left.

Around 9:00 to 10:00 that morning Mike, with his wife Linda, appeared at Linda's sister's house in Sawyer, some twenty miles east of the ranch. Linda asked if she could spend the day, and when the

sister said yes, Mike left Linda and went on. Linda explained to her sister that Mike had been informed of a fire at his grandmother's and was going down to check; he didn't want Linda or their dog along down at the ranch. In mid-afternoon Mike called Linda and reported, as Linda told her sister, that there hadn't been a fire at the ranch that day, after all.

*Wednesday, April 7:* Mike and Linda went to a farm sale in the morning. Around 11:00, Mike picked up his mail from Mrs. Braden. She asked about Goldie's flu of the previous week, and Mike replied that she "gets her flu in pint bottles."

In the early afternoon Mike called his stepfather, Bill Kratzer, in Colorado Springs, charging the the call to Goldie's number. Mike said he had some business to discuss, and they agreed he would go to Colorado the next day.

Around 4:00 to 5:00 that afternoon Mike and Linda were in the Belvidere general store. While there, he told Ellen Davis that his grandmother was on "a helluva binge." She was unconscious, he said, and he was going to Colorado to the next day to see his mother to see what could be done. Mrs. Davis saw him dial Goldie's number on the store's phone, but he got no response. He had also mentioned Goldie's drinking to Mrs. Davis a couple of days before— the first time he had ever talked about her like that.

*Thursday, April 8:* At 5:15 a. m., a truck driver reported to a Greensburg policeman that there was a fire somewhere south of Haviland. Pratt police were alerted by the dispatcher but were unable to locate the fire. The Haviland city marshall was called at 5:20, and he drove south until he located first a glow; then a pasture fire, and finally the ranch house burned to the ground. The ranch is some ten to twelve miles south of Haviland. He arrived at 5:55 a. m., and was soon joined by firemen he had summoned on the way, and other police officers.

Ten minutes later Mike called his mother in Colorado Springs from Lamar, Colorado. It was 5:05 a. m., Mountain time. He wanted to announce that he would be there in a few hours. When his mother asked how Goldie was, Mike told her it was not a business trip, that his grandmother was very sick, and that "this time she isn't going to make [it] if you don't come and take her to the hospital."

Twenty to thirty minutes later, around 5:30, Mrs. Kratzer had another call, this time from Ellen Davis of Belvidere. Mrs. Davis

broke the news that Goldie's house had burned down, and that neither Goldie nor her dog could be found. Mrs. Kratzer had given the dog to her mother, and knew he was her constant companion.

Yet a third call came to the Kratzer house at 8:00 a. m. This was from a ham radio operator, saying that Mike had called him on his truck radio and asked him to relay a message that he would arrive in about fifteen minutes. At 8:15, Mountain time, Mike arrived as promised. He then learned from his stepfather, ostensibly for the first time, that his grandmother's house had burned.

In the meantime, however, more than two hours earlier, Mike had made the telephone call that was eventually to lead to his undoing. Mrs. Mildred Elving operated the apartment house where Mike and Linda lived in Pratt. At 7:00 a. m. Central time (6:00 Mountain time) her phone rang and it was Mike. He asked her to go down to their apartment and get Linda—it was an emergency. Mrs. Elving did, and Linda came to the phone. She became hysterical while listening, and after she hung up reported "That was Mike, and he said that his grandmother burned up in a fire."

### The Aftermath

Mike's first reaction to the news of his grandmother's probable death was silence, so his stepfather invited him into the house. There the first thing he did was to call the electric company serving the ranch and arrange for a hot wire at the transformer so the yard light would be on twenty-four hours a day. Then, about 10:30, he and his mother got in his truck and headed for the ranch. En route his mother wondered out loud how the fire could have started. Mike suggested first that Goldie hung her clothes around the hot water heater, and second, that she kept gasoline around for dry cleaning. The conversation turned to the state of Goldie's affairs, and Mike reassured his mother that they were all in order. He added: "Don't forget, I don't want it to cause hard feelings— But—the will is made out to me. Your sister and you get one thousand dollars apiece, and I think Carla and Bill [Mike's sister and brother] get something, but it's all mine."

They arrived at the ranch around 5:30 p. m., to find numerous police officers at the scene. At that time Mike told a K. B. I. agent that he had been at the ranch shortly after midnight to check on his grandmother. She was very drunk when he left her to go to Colorado; he only learned of the fire when he got to his mother's

house at Colorado Springs. He speculated first that the fire was caused by the furnace, which had been acting up, and later thought the cause might have been pack rats chewing through the electrical wiring. He delivered to the officers the keys to Goldie's car, which was still in the garage.

An intensive and extensive search was conducted for Goldie Millar or her body, extending over a period of several weeks. The ashes at the house were sifted and resifted; the ranch was combed by men on foot, in trucks and on horseback; missing persons bulletins were circulated. Skin divers and scuba divers searched the ponds, and airplanes surveyed the landscape.

The ashes of the house produced nothing in the way of human remains. Expert testimony was that a normal house fire is not hot enough to burn a human body without leaving a trace. The ashes did yield the badly charred remains of Goldie's dog, a German shepherd named Brandie. He was described as having been very devoted to and protective of her. No stranger could approach unless Goldie told Brandie to stay back. (This was the same dog that had "got hold of" Alfred Barby in the past.) Brandie's head was charred but largely intact. Later medical examination revealed a .22 caliber shell casing lodged in one eye socket. The cartridge had exploded from heat, and bore no marking from a firing pin. A .22 pistol was found in the ruins in the basement.

The officers' investigation as well as the search for Goldie continued. On April 29, K. B. I. agent Dewey interviewed Mike again, and heard him recount again his midnight visit to the ranch and his trip to Colorado. He again told of Goldie's heavy drinking, this time adding that "the house was full of Old Charter whisky bottles." He again asserted that the first he learned of the fire was in Colorado Springs at 9:00 Central time, when his stepfather told him of Ellen Davis's call.

Continued investigation began to turn up weaknesses in Mike's story. Contrary to his tales about her three week binge, all the witnesses who saw Goldie during the first week of April—and they were many—testified that she seemed normal, cheerful, and totally sober. They detected no evidence that she had been drinking. A sifting of the house ashes turned up no molten glass globules of the dark brown color characteristic of Old Charter bottles; expert testimony indicated that they would be there if such bottles had been in the house. Most critical of all, the investigators turned up

Mike's telephone call to Linda, telling of the fire and his grand-mother's death some two hours before he was supposed to have learned of it.

Armed with this information the officers again confronted Mike and secured a series of statements, to be discussed later, implicating him in the death of Goldie and in setting the fire. The result was a charge of first degree murder and aggravated arson, and the present conviction of first degree murder and simple arson. This appeal followed.

## I. THE CORPUS DELICTI

The foregoing, rather lengthy exposition of the state's evidence is made necessary primarily by the claim on appeal that the state failed to prove the corpus delicti. While we have no reported murder case in this state in which no portion of the victim's body was found, we have recognized that "It is well-established that any material facts, including the corpus delicti itself, may be proved by direct testimony or by indirect or circumstantial evidence, or a combination of both." *State v. Griffin,* 210 Kan. 729, 731, 504 P. 2d 150. To the same effect, we have observed that "No exclusive mode of proof of the *corpus delicti* is prescribed by the law." *State v. Phippen,* 207 Kan. 224, 230, 485 P. 2d 336.

As to what must be proved we have said, "In homicide cases the *corpus delicti* is the body or substance of the crime which consists of the killing of the deceased by some criminal agency and is established by proof of two facts, that one person was killed, and that another person killed him." *State v. Phippen,* supra, Syl. ¶ 3. See also, *State v. Doyle,* 201 Kan. 469, 441 P. 2d 846.

Even though we have not previously had occasion to consider a homicide case in which the proof of the corpus delicti was purely circumstantial the foregoing principles clearly establish that such proof is sufficient. Many other jurisdictions have so held in murder cases where no body was found. The applicable rules are aptly stated and amply supported by citations of authority in *People v. Bolinski,* 260 Cal. App. 2d 705, 714-15, 67 Cal. Rptr. 347, 353:

"The corpus delicti of murder consists of two elements: the death of the alleged victim and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. [Citations omitted.] The elements must be established independently of admissions or confessions of the defendant . . . but as a basis for introduction of the defendant's confession or admission, the prosecution is not required to establish corpus delicti by proof as clear and convincing as is necessary to establish

guilt; a slight or prima facie showing is sufficient. [Citations omitted.] Once corpus delicti is shown by independent evidence, the degree of the crime not being a part of the corpus delicti, the circumstances of the murder and its degree may be shown by extrajudicial statements of the accused. [Citations omitted.] It is for the trial court to determine whether a prima facie showing has been made. [Citations omitted.]

"Production of the body of the missing person or of evidence of the means used to produce death are not essential to the establishment of corpus delicti or to sustain a murder conviction. [Citations omitted.]"

In this case there was ample evidence, independent of Mike's admissions, from which first the court and later the jury might infer that Goldie was dead, and that she had been the victim of foul play. Such evidence included: the fact that she was never heard from after April 5 by her friends and customary associates; the strained relations between Mike and Goldie; the carefully constructed alibi consisting of his fabricated charges of drunkenness and the all-night trip to Colorado; the false-alarm fire of two days before; Mike's avowed intention to get the ranch "one way or the other;" and ultimately his premature display of knowledge of the fire and her death. Some of this evidence served a dual purpose; it not only showed that Goldie was dead by criminal means, but pointed the finger of guilt at Mike. The fact that it bore also on who was guilty does not detract from the efficacy of this evidence in establishing the corpus delicti.

The defense moved for an acquittal on the ground that the corpus delicti was not proved. The motion was properly overruled.

## II. Venue

Appellant argues that in the absence of a body it was impossible to prove that the murder took place in Kiowa county. The state's evidence indicated that Goldie did not in fact die in the fire. The jury convicted of simple arson (K. S. A. 21-3718 [Weeks 1974]), and not aggravated arson as charged (K. S. A. 21-3719 [Weeks 1974]). Since the difference is the presence of a human being in the burned building in aggravated arson, he concludes the jury found that Goldie was not in the house. From this he argues that, even if Mike killed her, he might have done so anywhere. He points out that venue is jurisdictional, and must be proved by the state. See, e. g., State v. Jones, 204 Kan. 719, 466 P. 2d 283, and cases cited.

Venue, however, is a question of fact to be determined by the jury, and like any other fact may be proved by circumstantial evidence. State v. Addington, 205 Kan. 640, 472 P. 2d 225; State v.

*Fleury,* 203 Kan. 888, 457 P. 2d 44; *State v. Joseph Little,* 201 Kan. 101, 439 P. 2d 383. Our applicable venue statute, K. S. A. 22-2603 (Weeks 1974) provides that "Where two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur." The question, therefore, is whether the jury could infer that the murder, or any act "requisite" to it, occurred in Kiowa county.

A somewhat similar situation was presented in *State v. Zimmer,* 198 Kan. 479, 426 P. 2d 267. There a little girl was abducted in Shawnee county and her body later found in Pottawatomie county. The question was whether venue for a felony murder charge lay in Shawnee county. This court held it did, under the forerunner of 22-2603. The court observed that the place where the body was found was within five or six minutes driving time from three adjoining counties, and commented (p. 499): "A murderer should not escape punishment because the exact place of his crime is concealed."

More directly in point is *People v. Scott,* 176 Cal. App. 2d 458, 1 Cal. Rptr. 600, the only case cited or that we can discover dealing with venue in a missing-body murder case. In that case the defendant was convicted of murdering his wife, who had simply disappeared without a trace. The court there reviewed at length a number of cases, including one from New Zealand and one from England, in which murder convictions had been upheld in the absence of a body. On the corpus delicti aspect of the case it reached conclusions which generally were in accord with those in *People v. Bolinski,* supra.

On venue, the evidence indicated that the missing wife was last seen alive in her home in Los Angeles County on a May 16th, and that she disappeared that night. The court found "If she was murdered on that night, it was either in her home or by someone who spirited her away with the intention of taking her life and disposing of her body so it could not be found. If the latter, and if she met her death outside the county of Los Angeles, jurisdiction would be in Los Angeles County as in any other county in which she might have met her death." (P. 501.)

In so holding, the court relied on § 781 of the California penal code, a venue statute providing:

"When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite

to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory."

The similarity to our own K. S. A. 22-2603 is apparent.

So, in the present case, if Goldie was removed from her home and killed in another county, the removal was an act "requisite" to the commission of the murder; venue would still be proper in Kiowa county. The motion for acquittal on this ground was also properly overruled.

## III. The Confessions

Mike confessed or made damaging admissions on six separate occasions. The first, from which all the others are claimed to flow, came on May 11, 1971. On that day, at about 1:10 p. m., K. B. I. agents Duane Bell and Alvin Dewey met with Mike and his retained attorney, Harold S. Herd, in Herd's office in Coldwater, in the adjoining county of Commanche.

After first advising him fully of his rights, the agents confronted him with their knowledge of his premature phone call to his wife in which he told her about the fire. At 2:00 Mike broke off the interview and went to have coffee and confer privately with his attorney. They returned about 3:00, but Mike left again almost immediately, and returned ten minutes later. He again asked to confer privately with his attorney in another room. There he revealed that he had just taken an overdose of pills in an effort to commit suicide.

Mr. Herd promptly informed the K. B. I. agents, who called the sheriff. The three officers took Mike to the emergency room of the Coldwater hospital where a physician induced vomiting. Particles of a capsule were retrieved which proved to be Librium. Although there is no evidence in the record as to the nature or effect of this drug, we assume it is the rather commonly prescribed tranquilizer of that name. (See Lingeman, *Drugs from A to Z: A Dictionary* [1969], McGraw-Hill Book Co.) Agent Bell testified that Mike was ill for just a few minutes after vomiting.

The two agents remained in the emergency room while Mike was treated, and when the doctor left two nurses also remained. Some time later Mike asked the nurses to leave, saying he wanted to talk to the agents alone. After the nurses left he told the agents, "I don't know how much Mr. Herd would want me to tell you men but I am going to tell you exactly what happened."

He then proceeded to describe the difficulties that had developed between him and Goldie ever since he had been married. He attributed most of the trouble to his grandmother's hatred of his wife Linda, saying she had threatened to kill her and had once attacked her. Goldie had been urging him to divorce Linda and even, he said, offered to pay for the divorce.

On the night of April 7 he had arrived at the ranch about 11:00 p. m. to find Goldie drunk and still drinking. Goldie again abused Linda verbally and urged divorce. When he refused, he said, Goldie threatened to "get rid of Linda one way or another, just like she did Bud Pyle." Bud Pyle was Mike's father, who had committed suicide when Mike was a boy.

At that point, Mike said, he was scared, but agreed to go to Colorado to talk to his mother. At Goldie's urging he napped for an hour or so before starting out. When he awoke he found her passed out on the floor in the dining room hallway. He then went to the garage, got three one-gallon jugs of transmission fluid, and poured it on the floor of the living room. When he ignited it, it burned "very fast." When he left the floor and one chair were in full blaze.

He then told of going to Colorado, and of calling Linda from Las Animas, Colorado, while en route. At the conclusion of his story he turned to agent Bell and said, "I hope you and Mr. Dewey will understand why I had to kill my grandmother."

After making this statement Mike was formally placed under arrest for murder. At his request he was permitted to telephone Linda at the house where they were then living near Jetmore. He was then booked into the Comanche county jail about 5:30 p. m. That evening the agents took Linda some money he gave them and his car keys. He drew a map showing how to get to the house, which they successfully followed.

The next day, May 12, the agents returned to the Comanche county jail to get Mike's statement in writing. He was again advised of his rights and agreed to retell his story, slowly, so it could be taken down. He declined to sign it, however, until after he had talked to his attorney. This statement was substantially the same as his oral statement of the day before.

That same day Clark Yost, a friend of Mike's came to visit Mike in the Comanche county jail. Yost described their conversation:

". . . He asked me first if I wondered why he was there. I told him it really didn't matter that I'd just come up to visit him. He said Mrs. Millar

had been upset with Linda and had threatened her a couple of times and he didn't like it and was going to put a stop to it. He said he just buried her up. He said he recalled that he had seen a check written for $22,000 in payment to someone for part payment to do away with Linda. When he used the phrase 'burned her up', he said he'd done that to protect Linda."

Yet a fourth admission (the third that day) came when sheriff Hogan visited with Mike while he was still in the Comanche county jail. Sheriff Hogan gave him a complete Miranda warning, and the two of them talked for about an hour and a half. Mike went over his life from the time he was a little boy, through military school, the troubles over the years at the ranch, and events since the fire. In particular Mike recalled a time some two weeks after the fire when he, the sheriff and some other men had gone to the tenant house on the ranch to get some furniture Mike had stored there. Two men were loading a truck and John Wallace, the undersheriff, had gone down to the creek, leaving Mike and the sheriff sitting in the yard alone. Sheriff Hogan recounted Mike's reminiscences about that episode:

" 'That when we were down there sitting in the yard visiting, Mr. Hogan, I come almost telling you about this.'

"And he said, 'If Mr. Wallace hadn't come back when he did I was going to.'

"Then he went into other stories, and he said about school, about all the trouble they had had, the financial trouble of the ranch, and built up into the animosity Mom [Goldie] had against Linda Pyle, Mike's wife, till he made the statement that, 'I should have cut her throat one other time.'

$\cdot \quad \cdot \quad \cdot \quad \cdot \quad \cdot \quad \cdot \quad \cdot \quad \cdot \quad \cdot \quad \cdot \quad \cdot$

"I said, 'I don't know what you mean, Mike.'

"He said, 'You recall when Mom was going to tear down my fence off of my porch?' And I said, 'Yes, I recall that.'

"Well, it seems as though there was a little 10 or 11-year old niece of Linda's, I believe it was, that was staying with them. Mrs. Millar supposedly had a knife and was after Linda and nearly scared the little girl to death."

This reference to throat cutting was the first reference, albeit obscure, to the possibility that Goldie might have died otherwise than in the fire.

By the next day, May 13, Mike had been removed to the Kiowa county jail. There agent Bell stopped by and Mike asked him for some cigarettes. Bell describes the encounter that ensued shortly after noon:

"A. I took the cigarettes to Mike, and at that time he told me, he said, 'Mr. Bell, I haven't been completely honest with you.' He said, 'I've decided to tell you where Mrs. Millar's body is.' He said, 'It's so gruesome and horrible I only want to tell it once. Will you go get Bill Hogan and bring the

Sheriff in so I can tell you both at the same time.' I told him, 'Yes, Mike, I will. But tell me one thing: will we be able to recover the body?' And he answered, 'Yes, sir.' I then left the jail area to walk out the door where I met Sheriff Hogan and Linda Pyle. Linda said, 'I want to see my husband.' And I said, 'Linda, Mike wants to talk to us a little bit first.' And she said, 'No, I want to see him right now.' And she brushed past me and walked into Mike's cell, went into the cell block area.

"Q. Then what occurred?

"A. About 45 minutes later I and Sheriff Hogan went back in to talk to Mike again and asked Mike if he wanted to tell us where the body was, and he said, 'I've changed my mind. She died in the fire.' "

The sixth and last confession came later that day in an office in the Kiowa county court house. Present were agents Bell and Dewey, Mike, and Mike's attorney Mr. Herd. In this version he again told how Goldie had been drinking heavily, but this time he related a conversation in which she told him that she was going to sell part of the ranch to pay debts, and wasn't going to leave him anything in her will. He became angry because he couldn't stand to see her sell part of the ranch. He again told of her passing out in the dining room, of his spreading the three gallons of transmission fluid, and of his starting the fire. After he left, however, he said he had a change of heart and attempted to go back in to get her out. He tried the front door but it was locked and he couldn't get in, so he went to the back door and kicked it in. Two attempts to reach her failed because of the heat and smoke, so he got in his car and drove to Colorado.

At the end of his story his attorney asked if this was a true and complete confession, and Mike said that it was.

On appeal the attack on these confessions is made on two grounds. First, it is contended that the first confession, made at the hospital in Coldwater, was involuntary because it was not immediately preceded by a warning as to his rights. There is no merit to this contention. Just three hours earlier he had been given a concededly complete warning in his attorney's office. His attorney was present and specifically asked him if he understood his rights, and he replied that he did. His remark that "I don't know how much Mr. Herd would want me to tell you men" evinces an understanding of those rights. Once a suspect is fully advised of his rights and understands them, it is not necessary to give repeated Miranda warnings each time he is interviewed. See, *State v. Boyle,* 207 Kan. 833, 486 P. 2d 849; *State v. Riedel,* 211 Kan. 872, 508 P. 2d 878.

The second attack on the confessions goes to Mike's mental ca-

pacity to give them voluntarily and knowingly. A pretrial motion to suppress the confessions was filed, based on his alleged insanity and emotional stress at the time he made them. The trial court conducted a *Jackson v. Denno* hearing to determine their admissibility. (*Jackson v. Denno*, 378 U. S. 368, 12 L. Ed 2d 908, 84 S. Ct. 1774, 1 A. L. R. 3d 1205. See also, *State v. Milow*, 199 Kan. 576, 433 P. 2d 538.)

At the hearing the state introduced the testimony of agent Bell, who described his several meetings with Mike. He started with the arrival of Mike and his mother at the fire scene on the evening of April 8, included a portion of the interview of April 29, and ended with the various meetings at which Mike gave his divers statements. He described giving the Miranda warning at each meeting starting with that of April 29, except for the discussion at the hospital which Mike initiated. On each occasion Mike appeared normal, in control, and to have full knowledge and understanding of his position. He pointed to the accurate and detailed map of the route from Coldwater to the rural house near Jetmore as demonstrating Mike's firm grip on reality at the time he was in the Coldwater hospital.

The defense countered with expert psychiatric testimony. Following Mike's arrest and the filing of charges he was referred to the state security hospital at Larned to determine his competency to stand trial. He was received there May 26, 1971. At the end of 60 days it was determined that he was not competent, and he remained at the hospital. On September 10, 1971, he was determined by the staff to be competent. A Larned staff psychologist, staff neurologist and staff psychiatrist all testified, along with a clinical psychologist who had examined Mike in the Kiowa county jail before the referral. While these experts varied somewhat in their diagnoses, they all agreed that he was suffering from some form of mental aberration which in their opinion made him incapable of giving a voluntary admission or confession. The psychiatrist, however, when asked if Mike understood what he was doing the day he talked to the officers, responded, "I think he probably did understand what he was doing."

The state then introduced its own expert, Dr. Francis Broucek, a psychiatrist at The Menninger Foundation who had supervised a three day evaluation in December, 1971, and who had available the records of Mike's stay there in 1956. In his opinion no psychiatrist—neither he nor those at Larned—could project backward from

the time of his examination and determine whether in April or May, 1971, Mike "understood what he was doing, whether he knew right from wrong, [or] whether he understood the nature and quality of the acts that he was going through."

The quoted phrase will be recognized as the traditional *M'Naghten* test for criminal responsibility, which is the test applicable in this state. *State v. Andrews*, 187 Kan. 458, 357 P. 2d 739. This same test of mental competence is used to determine whether an accused is so incompetent as to be unable to confess to a crime voluntarily. *Andrews v. Hand*, 190 Kan. 109, 117, 372 P. 2d 559, cert. den. 371 U. S. 880, 9 L. Ed. 2d 117, 83 S. Ct. 152.

There is no doubt that Mike was under considerable mental strain at the time he confessed in the hospital; his suicide attempt attests to that. After all, his alibi had just evaporated. But in the absence of insanity meeting the *M'Naghten* test, "[t]he mental condition of a defendant at the time he makes a statement is relevant to the issue of voluntariness but is not necessarily conclusive; its weight is for the trier of fact." *State v. Brunner*, 211 Kan. 596, 507 P. 2d 233, Syl. ¶ 5. At a *Jackson v. Denno* hearing such as this the trial court "is not bound to adopt the opinion of a medical doctor qualified in psychiatry to the exclusion of nonexpert testimony on the issue of the defendant's mental condition . . . at the time the defendant was advised of his constitutional rights and interrogated." *State v. Harden*, 206 Kan. 365, 480 P. 2d 53, Syl. ¶ 3.

The trial court overruled the motion to suppress, thereby impliedly finding that the confessions were knowingly and voluntarily made, and that Mike was not insane at the time of making them. Such a finding is binding on this court if supported by substantial competent evidence. *State v. Wilson*, 215 Kan. 28, 523 P. 2d 337; *State v. Creekmore*, 208 Kan. 933, 495 P. 2d 96.

In this case the defense's evidence fell far short of asserting that Mike's mental state when he confessed met the *M'Naghten* test of insanity. The defense psychiatrist's testimony, in particular, was to the contrary. Even if there had been such evidence, the trial court would not have been bound to accept it, particularly in view of the doubt cast on its validity by the testimony of Dr. Broucek. On the other side, the lay evidence of Mike's awareness was sufficient to support the trial court's finding of sanity and voluntariness. Cf. *State v. Blake*, 209 Kan. 196, 495 P. 2d 905, Syl. ¶ 3; *In re Estate of Roberts*, 192 Kan. 91, 386 P. 2d 301, Syl. ¶ 2.

It was not error to overrule the motion to suppress or to admit the confessions into evidence.

## IV. THE DOCTOR-PATIENT PRIVILEGE

In October, after Mike had been at the Larned hospital for over four months, a notice was filed on his behalf of his intention to rely on insanity as a defense. At the close of the state's case the defense proffered the testimony of the psychologist, neurologist and psychiatrist from Larned who had examined him on his competency to stand trial, and who had testified on the pretrial motion to suppress. Before putting them on the stand, however, counsel asked for a ruling on the applicability of what is now K. S. A. 22-3302 (3) (Weeks 1974), dealing with proceedings to determine a defendant's competency to stand trial. The last sentence of that section provides:

". . . No statement made by the defendant in the course of any examination provided for by this section, whether the examination shall be with or without the consent of the defendant, shall be admitted in evidence against him in any criminal proceeding."

The trial court made the following ruling:

"The statute makes it a privileged communication, anything the defendant may have told them during their examinations for determination of whether or not the defendant would be able to stand trial, but if the doctors that you have named doing that examination should testify on matters that might involve conclusions that would be based on what they might have been told by the defendant, the court rules that the privilege would be waived and cross-examination would be allowed as to any basis they may have for the conclusions they may testify to resulting from the interview with the defendant."

We think that ruling was eminently correct. The purpose of the quoted portion of 22-3302 (3) is to facilitate a complete and thorough psychiatric examination of a defendant whose competency is in doubt, unhampered by any fear that what the defendant tells the doctor may be turned against him. Psychiatry being what it is, the need for free and open oral communication between the defendant and the doctor is obvious. Anything less would automatically cast doubt on the validity of the diagnosis.

But the establishment of an insanity defense is an entirely different matter. For that purpose a notice is required whereby the defendant agrees to submit to such mental examinations as the court may order. (K. S. A. 22-3219 [Weeks 1974].) Further, under that statute a report of *each* mental examination, including any by physicians of defendant's own choosing, is to be filed with the court and supplied to counsel for each side. Where a defense is

to be based on mental disease or defect, complete disclosure is the rule.

The reason for this rule is apparent. If the proffered defense witnesses in this case had testified they presumably would have offered expert opinions couched in conclusionary terms. ( K. S. A. 60-456.) On cross-examination the state would be entitled to elicit from each witness the "data" upon which his opinion was based. ( K. S. A. 60-458. Cf., *Casey v. Phillips Pipeline Co.,* 199 Kan. 538, 431 P. 2d 518; *Ziegler v. Crofoot,* 213 Kan. 480, 516 P. 2d 954.) In our adversary system no other way exists to test the credibility of an expert witness or the validity of his opinion. In the case of a psychiatric expert the underlying "data" would, presumably, be in large part the communications made by the subject to the doctor.

In this connection a colloquy at the hearing on the motion to suppress is illuminating. The Larned neurologist was testifying on behalf of the defendant, and the state objected to his recitation of Mike's medical history as being hearsay. Defense counsel responded:

". . . I think it is rather important to all of us, including the court, to know *the ingredients that made up the ultimate diagnosis* of the man and to determine whether or not he was competent. I am going to ask this doctor to talk about the dates of the admissions in the past, and I think for him to draw some conclusions about that *we are all entitled to know the ingredients that led up to it and that would justify his having drawn those conclusions,* and the medical history he used is a part and parcel of it, all coupled with his knowledge of it." ( Emphasis added.)

We agree. The value of an expert's conclusion can only be assessed in the light of the data available to him or, as counsel put it, "the ingredients that made up the ultimate diagnosis."

In *State v. Campbell,* 210 Kan. 265, 500 P. 2d 21, a psychiatrist was appointed as a commission to determine competency under former K. S. A. 62-1531, the predecessor to 22-3302. A similar claim of privilege was set up as to the defendant's communications to the doctor. We held that there was no privilege for three reasons. First, since the defendant had not sought out the doctor for any purposes relating to diagnosis or treatment, under K. S. A. ( then 1971 Supp.) 60-427 ( *a*) he was not a "patient." Second, there is no doctor-patient privilege in felony cases under 60-427 ( *b*). Third, since the condition of the defendant was an element of his defense, there was no privilege under 60-427 ( *d*).

The competency statute in effect when the *Campbell* case was

tried contained no specific prohibition against the use of statements made to the sanity commission; the privilege was to be determined under the evidentiary rules relating to the doctor-patient privilege generally. The new statute alters that decision to the extent that, if a doctor is not called by the defendant, the privilege is absolute. We do not believe, however, that the statute was intended to extend the privilege beyond the extent necessary to effectuate its purpose. It is designed as a shield, not a sword. If the defendant proposes to alter the roles of the examining doctors from competency examiners to insanity defense experts, he must comply with the disclosure provisions of the insanity defense statute. If they take the stand, they, like any other experts, are subject to cross-examination as to the basis for their opinions. If the opinions are based on statements made by the defendant, those statements must be revealed, and to that extent the statutory privilege is waived.

In this case the trial court properly ruled on the claim of privilege. The fact that the defendant then chose not to call the doctors does not mean that his right to defend was improperly impaired, and there was no error.

## V. The Lesser Included Offense

Appellant's final argument is that the court should have, as he requested, instructed on the lessor included offense of voluntary manslaughter. That crime is "the unlawful killing of a human being, without malice, which is done intentionally upon a sudden quarrel or in the heat of passion." ( K. S. A. 21-3403 [Weeks 1974].)

On when the duty to instruct on lesser included offenses arises we said in *State v. Masqua,* 210 Kan. 419, 502 P. 2d 728, Syl. ¶ 4:

"The district court has an affirmative duty to instruct on lesser included offenses even in the absence of a request by defense counsel or the prosecution; however, that duty arises only where the omitted instruction is required by the evidence and under circumstances where the appellant might reasonably have been convicted of a lesser offense if the instruction had been given."

Similar holdings may be found in *State v. Schriner,* 215 Kan. 86, 523 P. 2d 703, and *State v. Hollaway,* 214 Kan. 636, 522 P. 2d 364.

There is in the evidence in this case simply nothing from which the jury could have inferred that Mike killed Goldie, but did so "without malice" as is required by the voluntary manslaughter statute. "Maliciously" is currently defined as "wilfully doing a wrongful act without just cause or excuse." PIK 56.04 ( *a* ). It denotes an evil state of mind. *State v. Roberson,* 210 Kan. 209, 214,

499 P. 2d 1137, and cases cited. There is nothing to indicate that Mike's killing of Goldie was not wrongful, or that he had just cause or excuse. Neither was there the slightest scintilla of evidence that they had a "sudden quarrel" or that Mike ever reached a "heat of passion."

Looking at all the evidence, we find the issues before the jury to have been whether Goldie was killed at all, and if so whether the defendant killed her. If both questions were to be answered yes, then it had to be on a finding that Mike planned the killing, either for greed or to "protect" his wife Linda. All the evidence that points to Mike as the killer also points to a carefully contrived plan to make the death look accidental and provide him with an alibi.

Added to the mass of circumstantial evidence we have the extra-judicial confessions. That part of them which put Goldie in the house when Mike started the fire was discredited by the physical evidence and by his admission that he knew where the body was, and that it could be found. Those portions of the confessions in which he described his motives and the formulation on an intent to kill her, and in which he admitted killing her one way or another, were all unrebutted and were consistent with the other evidence in the case. If Mike did it, it was a premeditated killing—first degree murder, not something less.

We conclude that it was not error to refuse an instruction on voluntary manslaughter.

The judgment is affirmed.

APPROVED BY THE COURT.