907 P.2d 158 (1995)
Clinton FRUTIGER, Appellant,
v.
The STATE of Nevada, Respondent.
No. 25950.
Supreme Court of Nevada.
November 30, 1995.
Michael Specchio, Public Defender, John Reese Petty, Chief Appellate Public Defender, Washoe County, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Richard A. Gammick, District Attorney, and Terrence P. McCarthy, Deputy, Washoe County, for Respondent.

OPINION
YOUNG, Justice:
Charles Dickens noted, we should "take nothing on its looks; take everything on evidence. There's no better rule." Charles Dickens, Great Expectations ch. XL (1861). Therefore, even after discerning all the facts from the evidence, we conclude that there was not sufficient evidence to support the indictment or conviction of Clinton Frutiger ("Frutiger").

FACTS
The following is a summary of the evidence presented before the grand jury: Linda Walker ("Walker"), manager of the Regency Motel ("Regency") in Reno, testified that on June 29, 1993, she rented room number thirty-five to Peggy Poulter ("Poulter"). When Poulter registered at the motel, she registered a beige Oldsmobile, but she was driving a Ford pickup truck. On July 2, 1993, Walker rented room number thirty-seven to Frutiger. *159 When Frutiger registered, he drove the beige Oldsmobile to the motel. According to Walker, Frutiger and Poulter started "being together constantly." On July 23, 1993, Frutiger officially moved to Poulter's room. Although Walker testified that Frutiger and Poulter seemed very close, she once heard them yelling at each other. In addition, Mary Kathleen Coblentz, a tenant at the Regency, testified that once she witnessed Frutiger hit Poulter.
On approximately August 1, 1993, Frutiger paid two weeks' rent with cash. This was unusual because Poulter had always paid the rent with a check. On August 3, 1993, the occupant of room number thirty-six complained of a foul odor. Walker believed it was a ruptured sewer line. The next day, August 4, 1993, the maintenance man went underneath the building and discovered that the odor was not caused by a ruptured sewer line. Walker then went to room number thirty-five and told Frutiger that she was attempting to locate the smell. Frutiger said that "Peggy was in the shower." Walker then went back to her house, and five minutes later a maid informed her that Frutiger was leaving. Walker and the maintenance man then went to room number thirty-five, knocked, and walked in. Walker testified that there was a "putrid smell" and the shower was going; however, no one was in the shower. Walker also testified that there were flies everywhere. In addition, there were pots, pans, and garbage against the closet door. There was also a rag stuffed underneath the closet door. Walker opened the closet door and saw a large object in the closet with garbage bags at each end. She then called the police.
Detective Steven Reed ("Reed") testified that he found Poulter's body in the closet nude, in two garbage bags, and wrapped in a blue comforter. The motel room had not been broken into and there was no male clothing in the motel room. The detective found Poulter's purse; however, Poulter's driver's license, credit cards, and checks were missing.
Poulter's body was taken to Dr. Roger S. Ritzlin ("Dr. Ritzlin"), a certified pathologist. Dr. Ritzlin testified that Poulter's body was severely decomposed and she had been dead for a minimum of two days, but it could have been over a week. Dr. Ritzlin also testified that he could not determine the cause of death because of the decomposition. In addition, Dr. Ritzlin testified that Poulter had coronary artery sclerosis (hardening arteries) and a fatty liver. The fatty liver is a typical sign of heavy drinking.
Dr. Ritzlin testified that Poulter's blood alcohol level was.341; and although blood alcohol may increase with decomposition, Poulter's blood alcohol alone could have caused her death. In sum, Dr. Ritzlin determined that Poulter could have died of heart disease, cirrhotic liver, alcohol consumption at a lethal level, or strangulation  although specific signs of strangulation could not be determined because the body was severely decomposed.
Detective David Phillip Jenkins ("Jenkins") testified that he discovered Poulter's beige Oldsmobile on August 5, 1993, outside the Carson Nugget. Later, Frutiger approached the Oldsmobile, looked in all four directions, and then entered the car. The police then "converged" on Frutiger and took him into custody. In Frutiger's wallet the police discovered Poulter's driver's license, one of her credit cards, and an automatic teller machine ("A.T.M.") receipt from her account. In the car was a briefcase that contained numerous personal documents of Poulter's. Finally, Jenkins investigated Poulter's finances and discovered that each day from July 31 to August 4, 1993, Poulter's A.T.M. withdrawals were in excess of the limit that may be withdrawn in a single day.
Based on the evidence discussed above, on October 13, 1993, the grand jury indicted Frutiger. On November 5, 1993, Frutiger filed a pretrial petition for a writ of habeas corpus, arguing that there was not sufficient evidence presented to the grand jury to constitute probable cause for indictment. The district court denied Frutiger's pretrial petition for a writ of habeas corpus, and a trial was held on April 11-14, 1994.
Additional evidence was presented at trial. First, Betty Ann Hansen ("Hansen"), Poulter's mother, testified that Poulter moved to *160 Reno in May 1993 and stayed at Hansen's home. In June Poulter moved out and began staying at the Regency because she was attending computer school downtown.
At the end of July, Poulter introduced Hansen and Frutiger and expressed that she was very happy because Frutiger had graduated from college and was helping her with computers. Hansen saw Frutiger one other time when Frutiger came to Hansen's house and mowed her lawn.
Hansen testified that Poulter appeared in good physical health. However, on cross-examination Hansen admitted that Poulter was once turned down for employment because of high cholesterol and high blood pressure. In addition, Hansen admitted that Poulter was a "heavy drinker" and for a while had attended Alcoholics Anonymous, but then began drinking again. Finally, Hansen testified that Poulter was "very happy" that she met Frutiger and that if Poulter was abused in any way, she would have certainly told Hansen.
In addition, at trial Dr. Ritzlin expanded the testimony that he had previously given before the grand jury. Dr. Ritzlin revealed that he discovered "bleeding in [Poulter's] neck area." However, he clarified that this was a small area; and generally if someone is strangled, there is considerable trauma to the neck. Dr. Ritzlin testified that people who die of heart disease generally appear healthy right up to the time of death. Dr. Ritzlin affirmed his earlier conclusion that Poulter's death could have been caused by heart or liver failure. In addition, Dr. Ritzlin testified that the garbage bag over Poulter's head was "draped"  it was not tightened.
Dr. Thorn Butler ("Dr. Butler"), another pathologist, concluded that there was "uncontroverted evidence that she [Poulter] was a chronic alcoholic." Dr. Butler also concluded that Poulter had "mild heart disease" and "moderate diastolic hypertension." In addition, contrary to Dr. Ritzlin's testimony, Dr. Butler believed that as a general rule, blood alcohol level goes down in a decomposing body. However, Dr. Butler's ultimate conclusion was that the "most likely cause of death is due to the syndrome of chronic and acute alcoholism." Dr. Butler stated on cross-examination, "I think I can rule out strangulation; I don't think I can rule out asphyxiation."
Frutiger was found guilty of first degree murder and sentenced to life in prison without the possibility of parole. Frutiger appeals, raising several assignments of error. Because we conclude that there was insufficient evidence to support Frutiger's indictment and conviction, it is unnecessary to address Frutiger's remaining contentions.

DISCUSSION
Before a person may be held for trial, the grand jury must determine that there is probable cause to believe (1) an offense (otherwise known as the corpus delicti) has been committed; and (2) the defendant has committed it. NRS 172.155. On appeal, Frutiger first argues that there was insufficient evidence before the grand jury to prove the corpus delicti.
In proving the corpus delicti, "two elements must be established (1) the fact of death; and (2) the criminal agency of another responsible for that death." Azbill v. State, 84 Nev. 345, 350-51, 440 P.2d 1014, 1017 (1968) (citation omitted). In the case at bar, the fact of death is conceded. Therefore, the central issue is whether the grand jury could have found probable cause that Poulter's death was caused by the criminal agency of another.
The only evidence before the grand jury as to the actual cause of Poulter's death was Dr. Ritzlin's testimony that although Poulter could have died of natural causes, he could not rule out the possibilities of strangulation or suffocation. We conclude, primarily based on Azbill, that this is not enough evidence to prove Poulter died by a criminal agency and to have held Frutiger over for trial.
In Azbill, this court held that the defendant should not have been indicted because there was no proof that the death of the victim was caused by a criminal agency. In Azbill, the defendant lit the victim on fire in her bed. Although this was not prudent on the defendant's part, the pathologists both *161 agreed that the victim was dead before she was burned. In addition, the pathologists could not find any evidence of "natural causes, manual strangulation or suffocation." Id. at 353, 440 P.2d at 1019.
Although the State need not eliminate all non-criminal inferences, there must be sufficient proof of the hypothesis of death by a criminal agency. In the case at bar before the grand jury, the State clearly did not present sufficient proof of a hypothesis of death by a criminal agency because the State did not even assert what the hypothesis might be. The State did not submit a possible cause of death to the grand jury. The complaint simply asserted Frutiger was charged with murder by "means currently undetermined."[1]
This court's conclusion in Azbill was that the pathologists' opinions were "too speculative to warrant holding a person for trial." Id.; see also Hicks v. Sheriff, 86 Nev. 67, 69, 464 P.2d 462, 464 (1970) (affirming this court's finding in Azbill that "if it cannot be said there was sufficient evidence to make it appear the death resulted from another's criminal agency, the state has failed in its burden and the person charged may not be held to stand trial on that charge"). In the case at bar, Dr. Ritzlin informed the grand jury that there was medical evidence that Poulter could have died from liver failure, heart failure or a lethal dose of alcohol. In addition, Dr. Ritzlin informed the grand jury that there was no evidence of strangulation or suffocation, but those possibilities could not be ruled out.[2]
Although there was other evidence presented before the grand jury connecting Frutiger with Poulter's body, the present issue is whether her death was caused by a criminal agency. In Hicks, this court concluded that the fact that the defendant was driving the victim's car at the time of his arrest was only material to show probable cause that the defendant was guilty of the crime of murder if the corpus delicti of that crime had been established. Hicks, 86 Nev. at 69, 464 P.2d at 464. The dissent, exhaustively and exhaustingly, reiterates the facts that connect Frutiger with Poulter. We do not deny that if there was evidence to show that Poulter's actual death was caused by the criminal agency of another, there would be sufficient circumstantial evidence to uphold Frutiger's conviction. The dissent, however, confuses the two issues and ignores this court's decision in Hicks. Therefore, even considering the evidence linking Frutiger with Poulter, and considering Frutiger's not-so-prudent behavior, we conclude that there was not enough evidence for the grand jury to find probable cause that Poulter's death was caused by a criminal agency.[3]
In addition, at trial, "the fact of death and that it resulted not from natural causes, accident or suicide but from the criminal agency of another" must also be proved. See Sefton v. State, 72 Nev. 106, 109, 295 P.2d 385, 387, cert. denied, 352 U.S. 954 (1956). The dissent correctly cites authority that sufficient evidence to uphold an indictment may be of a quality that is only slight or marginal. However, the dissent uses this standard to show that the State met its burden "both before the grand jury and at trial." However, unlike before the grand jury where the death by a criminal agency must be proved by probable cause, at trial it must be proved beyond a reasonable doubt. See id. Therefore, the proper standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Poulter's death was caused by a criminal agency. See Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
In addition to the evidence stated above, evidence was presented at trial as to how Poulter may have died; however, this evidence did not support any theory that Poulter's *162 death was caused by the criminal agency of another. In fact, the evidence at trial served only to validate the fact that Poulter could have died of natural causes. At trial, Hansen testified that Poulter was an alcoholic and had been turned down for employment because of high cholesterol and high blood pressure. Dr. Ritzlin expanded his testimony and stated that a person who dies of heart disease generally appears healthy right up to the time of death. However, Dr. Ritzlin also testified as to "bleeding in [Poulter's] neck area," with the clarification that this was a small area; and generally if someone is strangled, there is considerable trauma to the neck.
In addition, Dr. Butler testified that Poulter had "mild heart disease" and "moderate diastolic hypertension." Dr. Butler concluded that he ruled out strangulation and that Poulter "most likely" died from chronic and acute alcoholism. Therefore, because there was insufficient evidence to show that Poulter's death was caused by the criminal agency of another, the jury could not have even reached the issue of whether there was sufficient evidence to link Frutiger with her death.
Accordingly, we reverse and vacate Frutiger's judgment of conviction.
SPRINGER and SHEARING, JJ., concur.
ROSE, J., concurring:
I believe there is insufficient evidence in this case to establish beyond a reasonable doubt that Frutiger committed the murder of Poulter.
The majority sets out the equivocal conclusions that the medical experts reached concerning Poulter's cause of death  she could have died from natural causes or from being asphyxiated. A similar situation is presented when a person disappears under suspicious circumstances and his or her body is never found, as in the Weeks case cited in the dissent. Since the body of the suspected victim is missing, other circumstantial evidence surrounding the death must be scrutinized. If a conviction is secured based upon the suspicious circumstances surrounding the death, this court must determine whether sufficient evidence was presented independent of the corpse to establish that the death was caused by the criminal agency of another.
Frutiger did indeed act peculiarly in keeping Poulter's body in the closet of his room for several days and failing to inform others of her death. Frutiger's use of Poulter's credit cards several days after her death also does not cast him in a favorable light. However, even though these facts raise the suspicion that Frutiger was the murderer, other explanations are plausible.
When all the evidence is reviewed along with the medical uncertainty of the cause of Poulter's death, I find that, as a matter of law, there is not sufficient incriminating evidence upon which to sustain a first degree murder conviction. Accordingly, I concur with the conclusion reached by the majority.
STEFFEN, C.J., dissenting:
I suggest that the majority's reliance on Charles Dickens as the basis for a preeminent rule applicable to this case is greatly misplaced. The principle applicable here is one of law rather than philosophy, and it states that "[w]here ... there is substantial evidence to support the jury's verdict, it will not be disturbed on appeal." Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981). Indeed, if we were to resort to literature for supportive citations, I suggest William Shakespeare's Hamlet, Prince of Denmark would solidly upstage Dickens where Marcellus exclaimed, "Something is rotten in the state of Denmark." Act I, Scene 4. Unfortunately, the fruits of villainy in the instant case existed far from Denmark in the form of a decomposed corpse discovered in Reno, Nevada. "Ay, there's the rub." Act III, Scene 1. Because there is substantial evidence supporting Frutiger's conviction for first-degree murder, I respectfully dissent.
I disagree with the majority's conclusion that the grand jury had insufficient evidence upon which to find probable cause that the victim's death was caused by a criminal agency. The law applicable to sustainable indictments is that the State must present only sufficient evidence to create a reasonable inference *163 that the accused committed the charged offense. Such evidence may be of a quality that is only slight or marginal. State v. Boueri, 99 Nev. 790, 672 P.2d 33 (1983). The State met its evidentiary burden, both before the grand jury and at trial. I will, however, confine my discussion of the evidence to Frutiger's trial, since, to this writer's knowledge, our court has not reversed criminal convictions resulting from trials on the merits even though the State's burden was arguably not met before a grand jury or at a preliminary hearing. See Snow v. State, 101 Nev. 439, 445, 705 P.2d 632, 637 (1985), cert. denied, Snow v. Nevada, 475 U.S. 1031 (1986), ("Assuming, without deciding, that a convicted defendant may challenge on appeal a denial of a pretrial petition for habeas corpus predicated upon lack of probable cause to indict... ."). The reason we do not reverse criminal convictions despite arguably deficient indictments is because indictments do not involve a determination of the innocence or guilt of an accused. See Etcheverry v. State, 107 Nev. 782, 785 n. 2, 821 P.2d 350, 352 (1991).
In the unreported case of Weeks v. Nevada, this court upheld two counts of murder against Weeks despite the fact that no bodies were ever found and that the corpus delicti was established solely by circumstantial evidence. In Weeks we relied heavily on Sheriff v. Larsgaard, 96 Nev. 486, 488, 611 P.2d 625, 626-27 (1980), for the proposition that proof of the corpus delicti may be demonstrated entirely by direct evidence, a combination of direct evidence and circumstantial evidence, or "totally by circumstantial evidence." (Emphasis supplied.) See also State v. Pyle, 532 P.2d 1309 (Kan. 1975). We also noted that "[t]he two elements of the corpus delicti of murder are (1) the fact of death, and (2) a criminal agency of another responsible for that death." Id. I suggest that both elements of the rule are met in the instant case.
The first element, the fact of death, is conceded. However, the majority, relying primarily upon Azbill v. State, 84 Nev. 345, 440 P.2d 1014 (1968), concludes that the State failed to satisfy the second element, i.e., prove that Poulter (the victim) died by means of a criminal agency. Azbill is distinguishable. In Azbill the court noted that the State's expert witness excluded fire as a cause of the victim's death, and that the victim "may have accidentally or possibly intentionally consumed too many barbiturates and too much alcohol while in a weakened, debilitated or demoralized condition causing her death." Id. at 353, 440 P.2d at 1019. However, the court proceeded to postulate that if the State had proffered a hypothesis that the defendant had knowingly encouraged or made available copious quantities of drugs and alcohol to the victim, a criminal agency could have been established to satisfy the corpus delicti requirements. Id. Moreover, the two medical experts found no evidence of death by natural causes, strangulation or suffocation, but suggested that death could have occurred by one of those means. In short, the court reversed Azbill's conviction because the State failed to produce a theory concerning death by criminal agency.
In the instant case, the medical experts could not exclude death by means of either suffocation or strangulation. The majority, casting aside the jury's factual finding of Frutiger's guilt, has actually reached the conclusion that most of the trial evidence concerning the victim's death "generally" favored Frutiger. Moreover, the majority concludes, ipse dixit, that the State "did not even assert what the hypothesis [of death by criminal agency] might be." This is flat out wrong. The State's position was that Frutiger murdered Poulter either by suffocation, strangulation or a combination of both, although the exact cause of death was not ascertainable because Frutiger kept the corpse hidden in a closet until it reached a state of decomposition that precluded such a diagnosis. Given the fact that murder convictions are sustained despite the lack of a corpse, the majority's ruling in the instant case would paradoxically jeopardize most prosecutions of nonwitnessed murder cases where a perpetrator is able to conceal the victim's body for a sufficient length of time to foreclose a precise determination of the cause of death.
*164 The circumstantial evidence against Frutiger is extremely compelling, and substantially supports the jury's finding that Frutiger murdered Poulter. Commencing with the fact that the medical testimony could not rule out Poulter's death by either strangulation or suffocation, consider the following circumstantial evidence against Frutiger:
1. Poulter moved into room 35 of the Regency Motel on June 29, 1993; Frutiger moved into room 37 of the Regency Motel on July 2, 1993.
2. On July 23, 1993, Frutiger "officially" moved into Poulter's room at the Regency Motel.
3. The motel manager, Linda Walker, once heard Frutiger and Poulter yelling at each other; another tenant, Mary Coblentz, testified that she witnessed Frutiger hit Poulter.
4. Although Poulter had always paid the room rent by check, on approximately August 1, 1993, Frutiger paid for two weeks' rent with cash.
5. On August 3, 1993, the occupant of room number 36 at the Regency Motel complained of a foul odor.
6. On August 4, 1993, a maintenance worker crawled underneath the building and determined that the odor was not caused by a ruptured sewer line; Walker then went to room 35 and told Frutiger that she was attempting to locate the source of the smell. Frutiger told Walker that Peggy (Poulter) was in the shower.
7. After Walker was told by Frutiger that Peggy was in the shower, Walker returned to her house; five minutes later, a maid informed Walker that Frutiger was leaving.
8. Walker and the maintenance man then went to room 35, knocked, and walked inside.
9. Walker testified that there was a "putrid smell" in the room and that the shower was on but not occupied; Walker also testified that there were flies everywhere, and that pots, pans, and garbage were piled against the closet door, and a rag was stuffed underneath the door.
10. Walker saw a large object inside the closet with garbage bags at each end; she then called the police.
11. Detective Reed testified that he found Poulter's nude body in the closet with a garbage bag over each end; there was also a dead cat inside one of the bags, and the body, cat and bags were wrapped in a blue comforter.
12. The motel room had not been forcibly entered and there were no male clothes in the room.
13. The detective found Poulter's purse, but her driver's license, credit cards, and checks were missing.
14. Detective Jenkins testified that he found Poulter's beige Oldsmobile outside the Carson Nugget in Carson City; later, Frutiger approached the car, looked in all four directions, and then entered the car.
15. The police converged on Frutiger, took him into custody, and found in his wallet Poulter's driver's license, one of her credit cards, and an automatic teller machine (ATM) receipt from the victim's account; police also discovered a briefcase in the vehicle that contained numerous documents belonging to Poulter.
16. Detective Jenkins investigated Poulter's account and determined that from July 31 to August 4, 1993, there were ATM withdrawals from Poulter's account that were in excess of the single-day withdrawal limit.
17. Poulter's mother, Betty Ann Hansen, testified that her daughter appeared to be in good physical health; she also testified that Peggy was "tight-fisted" with her money.
18. The victim's mother also admitted that Poulter had once been denied employment because of high cholesterol and blood pressure; she also admitted that Poulter was a "heavy drinker" who had attended Alcoholics Anonymous for a while before she started drinking again.
19. Walker testified that when Poulter was alive, there was nothing about Poulter's appearance that would indicate that she was in poor health.
20. A branch manager at First Western Bank testified that from May 10, 1993, the *165 date Poulter opened her account, to July 4, 1993, there were only three withdrawals made from the ATM and that otherwise Poulter had minimal activity on her account; she also testified that after July 4, 1993 (two days after Frutiger moved next door to Poulter), the ATM withdrawals greatly increased, and that from July 31, 1993 through August 4, 1993, the maximum amount of $500.00 per day was withdrawn each day.
21. Dr. Ritzlin, a certified pathologist who examined Poulter's body, testified that the body was severely decomposed and that Poulter could have been dead from a minimum of two days to over a week; Dr. Ritzlin also testified that he could not determine the cause of death because of the severe decomposition of the body.
22. Dr. Ritzlin, in pertinent part, testified that Poulter could have died from alcohol consumption at a lethal level (her blood alcohol level was determined to be .341), heart disease, cirrhotic liver, or strangulation; he also testified that he discovered "bleeding in Poulter's neck area," but clarified that it was a small area and that generally, strangulation involves a lot of trauma to the neck.
23. Dr. Butler, another pathologist, testified that after receiving the tests run by Dr. Ritzlin, and running some tests of his own, there was uncontroverted evidence that Poulter was a chronic alcoholic; he also concluded that Poulter had "mild heart disease" and "moderate diastolic hypertension."
24. Although Dr. Butler concluded that in his opinion the "most likely cause of death is due to the syndrome of chronic and acute alcoholism," he also stated on cross-examination that "I think I can rule out strangulation; I don't think I can rule out asphyxiation." Moreover, Dr. Butler reached his "most likely" conclusion after erroneously stating that Dr. Ritzlin, who performed the autopsy, did not find any evidence of trauma (Dr. Ritzlin found a bruise "in the neck, a small bruise about an inch by one half an inch near the thyroid cartilage"), or anything that would indicate strangulation (Dr. Ritzlin stated that "she [the victim] could have been strangled and I couldn't tell"). The foregoing recital of the evidence of record supplies the basic thrust of the trial evidence that convinced the jury that Frutiger was guilty of first-degree murder. Considering, as we must, the evidence in a light most favorable to the State, I have no difficulty affirming the jury's verdict. From the time of Poulter's death, none of Frutiger's actions has been consistent with innocence. To the contrary, hiding the body (while undoubtedly considering a plan for its disposal), lying to the manager about the victim being in the shower when she was, in fact, dead, and withdrawing the victim's money from her account as rapidly as possible, are all reflective of a guilty mind. Moreover, when it became apparent to Frutiger that he and his crime would soon be discovered, he left the motel, without notice, in the victim's vehicle.
The majority has in effect disregarded all of the evidence of Frutiger's guilt on the basis of the inconclusive medical testimony which Frutiger himself brought about by concealing the body until it reached a degree of decomposition that precluded a determination of the cause of death. The State presented a strong circumstantial case, and the medical experts could not rule out the State's theories of either suffocation, strangulation or a combination of both. Dr. Butler's opinion that the most likely cause of death was the syndrome of chronic and acute alcoholism was not fully informed, was not dispositive, and was not binding on the jury. Ironically, if Poulter's body had never been found, and Frutiger had been located in possession of Poulter's credit cards, money (removed from victim's ATM) and automobile, it is very likely that Frutiger would have been convicted of Poulter's murder on that circumstantial evidence alone.
I believe the jury was percipient and fully justified in drawing inferences of guilt against Frutiger from the strong circumstantial evidence adduced at trial. I therefore respectfully dissent.
NOTES
[1] The indictment was changed before trial to read "by strangulation and/or suffocation."
[2] In Azbill the pathologists could also "not rule out" strangulation or suffocation.
[3] We recognize, however, that Frutiger should have been charged with other crimes for his actions  but not first degree murder.